**beef & brew, inc., a Washington Corporation, Plaintiff,**

v.

**BEEF & BREW, INC., an Oregon Corporation, Defendant.**

**Civ. No. 73–340.**

United States District Court, D. Oregon.

Dec. 31, 1974.

---

Jere M. Webb, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for plaintiff.

James K. Buell, Phillips, Coughlin, Buell, Stoloff & Black, Portland, Or., for defendant.

## OPINION

BURNS, District Judge:

Two imaginative and successful restaurants, one based in Seattle and the other in Portland, are before this Court in dispute about rights to exclusive use of their common name. Plaintiff, a Washington corporation, seeks damages and an injunction, alleging trademark infringement, unfair competition, and violation of Oregon's Anti-Dilution Statute, ORS 647.107. Defendant, an Oregon corporation, denies Plaintiff's allegations and asserts that Plaintiff has been guilty of laches. Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332(a). For the reasons set out below, Plaintiff's request for relief is denied.

## FINDINGS OF FACT

In late 1969 and early 1970, Plaintiff and Defendant independently conceived the name Beef & Brew [1] (as the caption indicates, Plaintiff uses lower case letters) for a restaurant that would specialize in limited-menu single-price meals centered around high-quality beef and would offer a salad bar and unlimit-

---

1. The evidence showed that, as originally incorporated, the Defendant's name was "BEEF 'N BREW", later amended to "BEEF & BREW." Having occurred in April 1971, after Defendant's visit to Seattle and knowledge of Plaintiff's first Seattle operation, this change tends to support Plaintiff's claim that Defendant intentionally copied Plaintiff's successful name. Appropriation of an ampersand is certainly insufficient purloining to make a pirate, particularly when the change appears to have been suggested by the architects for design reasons. (Sabin deposition, p. 32)

ed beer or wine[2] with meals. Both parties drew their inspiration from trade publication articles about restaurants in New York City using a similar format, one named "Steak & Brew" and another "Roast Beef & Brew."

Plaintiff's unsuccessful "Village Square Restaurant," in the University Village Shopping Center in Seattle, was transformed into "Village Square beef & brew" and re-opened in April 1970. Success of the new concept under the new name was rapid. Plans were quickly made to open additional restaurants in the Seattle area. The second opened in May 1971 at the Renton, Washington, Sheraton Inn, the third at Burien, Washington, in September 1971 and a fourth in Lynnwood December 24, 1971. (As of the time of trial, Plaintiff had also opened 3 more restaurants: Tacoma, November 1972; Spokane, January 1973; and Anchorage, Alaska, in 1974). In May 1971 Plaintiff ordered (and shortly thereafter began using) cashier slips referring to planned restaurants in Portland and Vancouver. In the summer of that same year plaintiff gave casual consideration to possible sites in the Portland area. When Defendant's first restaurant opened in Portland on December 26, 1971, Plaintiff had four restaurants in operation— all in the Seattle area. Defendant's second restaurant opened in Beaverton in February 1973.

Both parties have done well, apparently reflecting capable business operations as well as validity of the concept coupled with the name. Plaintiff's business in 1970 with the single outlet was $302,285 which grew to $4,675,678 in 1973. Defendant has also shown strength, with gross sales in fiscal 1972 of $260,000 and in fiscal 1974 of $1,898,000.

Although the names and formats were independently devised, each of the parties had become aware of the other long before filing of this lawsuit. In late October 1970 (while attending a football game at the University of Washington) one of Defendant's architects, also an investor, learned that someone was using the name in the Seattle area. He heard an announcement over the stadium public address system.[3] When he returned to Portland, he advised his fellow investors of this discovery. In mid-December 1970, Defendant's principals went to Seattle to investigate Plaintiff's restaurant and others in the area that they hoped might furnish useful examples of limited-concept operations. They were shown through the Village Square beef & brew by the manager and the chef.

During their discussion with the manager, the Defendant's principals indicated not only that they were planning to open a limited-concept restaurant but also that they planned to use the name Beef & Brew. They did not ask about Plaintiff's plans to expand. The substance of this conversation, according to Humphries, Plaintiff's Village Square beef & brew manager, was relayed within a few days to Boyd Graves, Plaintiff's president. (Humphries' dep. pp. 14, 24). Graves, on the other hand, denies this and denies that he heard of Defendant or its plans to use the name until about October or November, 1971. In light of my disposition of the case, it seems unnecessary to resolve this conflict. The visitors returned to Portland and continued with development of their venture; financing delays set the opening date back from July 1971 to December 1971.

In April 1971, Plaintiff's vice president wrote to the Secretary of State of Oregon inquiring about registration of the name "beef & brew". He was advised that the name was unavailable because already registered to someone else. Plaintiff was apparently uncertain whether the Oregon name was being used in connection with a restaurant.

---

2. According to the evidence, plaintiff offered only unlimited beer to its patrons, due to Washington liquor regulations.

3. This witness reacted with surprise to hearing the name, which had obviously also been conceived by others. He said, "It sounded like somebody else invented the wheel."

Plaintiff made no further inquiry at that time concerning the actual use of the name in Oregon by Defendant or anyone else.

As to the registration and corporate adoption of the disputed name, the evidence showed the following. Plaintiff's corporate name in Washington was Boyd H. Graves Restaurant, Inc., until June 3, 1971, when the name was changed to "beef & brew, inc." Plaintiff filed for registration of the name in Washington July, 1970, and in July 1971 refiled for trademark registration of both the name and logo. Similar filings by plaintiff occurred in Idaho (June 1972), Alaska and Montana (October, 1972) and California (March, 1973). In May 1973, Plaintiff filed in California for reservation of the name as a corporate name. Defendant filed for an assumed business name registration in Oregon in July 1970 for both Beef'N Brew and Barney's Beef'N Brew in the three counties comprising the Portland metropolitan area as well as two other counties. In November 1970 it applied for reservation in California and Washington of the corporate name "BEEF 'N BREW, Inc.". (Under Washington law, this name reservation lapsed if unused after 180 days). In February 1973, Defendant applied for and received Oregon's registration of its trademark BEEF 'N BREW. (Deft.Ex. 108)

Through a supplier, Plaintiff's principals heard rumors in October or November 1971 that a restaurant bearing the contested name was under construction in Portland. Mr. Graves traveled to Portland and visited the site of the restaurant sometime in December 1971 before it opened. In January or February 1972, the opening and operation of Defendant's first restaurant were confirmed by a visit by one of Plaintiff's employees.

From December 1970 or October 1971 (whenever Graves knew of Defendant's name and plans) until April 1973 with the dispatch of a demand letter by Plaintiff's counsel, Plaintiff made no effort to inform Defendant of its alleged infringement or to protect the claimed trademark in any other way. Plaintiff at no time inquired of Defendant about any of its expansion plans. Plaintiff did consult counsel in the summer of 1972, requesting that appropriate and necessary steps to challenge Defendant's right to use the name be taken. This resulted in no action until the April 1973 letter to Defendant demanding termination of use of the contested name. During this period of Plaintiff's inaction, Defendant opened its two restaurants, incurring liabilities in excess of $2.5 million.[4]

Some *actual confusion occurred;* in the record is one letter to Plaintiff from a patron unhappy with inconsistent beverage practices from one restaurant to another.[5] Plaintiff has engaged in several advertising and promotion efforts aimed at the Portland market, keyed largely to the Sheraton Inn beef & brew. These were promotions aimed at Portlanders who might go to Seattle for horse racing, and Plaintiff hoped, while there, would lodge at Sheraton's Renton Inn and eat and drink at Plaintiff's Renton beef & brew. The true extent of confusion among actual or potential customers is quite uncertain, however. Plaintiff's expert, a marketing professor from the University of Washington, testified that in his opinion a substantial likelihood of confusion existed in December 1971. That testimony, as well as his evidence with regard to whether or not

---

4. The Defendant's principals were required personally to guarante the payments on the long-term leases on the two Portland restaurants in the amount of $2,547,857.00.

5. This patron, having had unlimited wine at Defendant's Portland restaurant, was disturbed when, at Plaintiff's Seattle restaurant, he found only unlimited *beer* available (See F.N. 2) See Airwick Industries v. Alpkem, 384 F.Supp. 1027, No. 72–755 (D. Or.1974), at p. 8, where a number of instances of actual confusion were held insufficient.

Plaintiff's name had a secondary meaning in the Portland area at that time was weak, though scholarly. His opinions on the elusive zone of expansion were not persuasive. This and the other evidence vital to Plaintiff's success here did not preponderate.

## CONCLUSIONS OF LAW

### I. DISTINCTIVENESS

With candor and in striking language, the Ninth Circuit has recently described the problems that confront lawyers and judges in the law regulating competition among businesses.

"Trademark infringement is a peculiarly complex area of the law. Its hallmarks are doctrinal confusion, conflicting results, and judicial prolixity. The source of this difficulty is that each case involves an effort to achieve three distinct objectives which, to a degree, are in conflict. These are: (1) to protect consumers from being misled as to the enterprise, or enterprises, from which the goods or services emanate or with which they are associated; (2) to prevent an impairment of the value of the enterprise which owns the trademark; and (3) to achieve these ends in a manner consistent with the objectives of free competition. The third objective dictates a degree of restraint in the pursuit of the first two; the second can be pushed beyond the reasonable needs of the first; and each requires for its proper implementation the exercise of judicial intuition supported, to the extent possible, by relevant facts. This case is no different from its kind, and we approach it with a keen awareness of its difficulty and our peril." HMH v. Brincat, 504 F.2d 713 (9th Cir. 1974).

At the heart of trademark infringement and unfair competition claimed in the circumstances of this case are two questions: Has a protectable right been created? Has it been infringed? Although the answers to these questions are in some measure interwoven, because the determinative criteria are overlapping, it will be helpful to both exposition and decision to treat them as conceptually independent and discuss them separately. If Plaintiff has no right, then I need not determine whether Defendant has violated it.

Protection is afforded only to the distinctive. An arbitrary or fanciful name, a random selection of five letters, for example, is immediately and of itself distinctive; use alone will create a right to protection. The right to protect a descriptive mark, however, cannot come solely from prior use without regard to the effect of that use. If the name draws attention to the ingredients, quality or nature of the product or service and thus is more nearly a description in common language than a name, then it must acquire distinctiveness and the right to protection from the effect of the owner's efforts in the marketplace. When a descriptive mark has been so used that the primary significance of the term in the minds of the consuming public is not the generic product (or service) but the particular product (or service) and its producer or supplier, the mark is protectable. This is the doctrine of secondary meaning. A name that tells the diner what his dinner will be is descriptive. I so conclude as to the name beef & brew whether used in lower case by Plaintiff or capital letters by Defendant.[6] Longchamps v. Eig, 315 F. Supp. 456 (S.D.N.Y.1970); Steak & Brew v. Beef & Brew, 370 F.Supp. 1030 (S.D.Ill.1974).

### II. SECONDARY MEANING

The next issue, therefore, is whether at the time Defendant opened

---

6. While not of record, it is interesting to note, from a recent newsmagazine an account of an unemployed lawyer working in what was generically described as a "beef and brew restaurant" and an even more re- cent ad in a Portland newspaper. See, Newsweek, December 9, 1974, p. 74; and, The Oregonian, December 16, 1974, p. 15; both are filed with the Clerk.

its first restaurant Plaintiff's name had acquired a secondary meaning. As one distinguished commentator has said, "no flat rules can be postulated with respect to the length of time required for, and the steps necessary to, the evolution of secondary meaning. It is, however, safe to say that no secondary meaning emerges full-blown at conception." Callman, vol. 3, § 77.3. Plaintiff suggests that secondary meaning merely refers to market reputation, but that is too low a hurdle. The name must leap to primary significance, and the Plaintiff has the burden of proving that the leap has occurred.

■ I conclude that in December 1971 Plaintiff's beef & brew had no secondary meaning in the Portland area. In Seattle itself, Plaintiff's beef & brew restaurants had been in operation only twenty months. No restaurant of that name was open in Portland. Advertising of the Seattle restaurants in Portland was sporadic and slight, not reaching the level of a concerted campaign to establish the name in that city. Plaintiff presented no consumer survey which showed widespread familiarity with the name. In short, Plaintiff at the end of the year 1971 was simply a developing restaurant chain in the Seattle area.

■ Cases granting geographically extensive protection for the names of well-established and widely known, indeed famous, restaurants are not persuasive here. See, e. g., Stork Restaurant v. Sahati, 166 F.2d 348 (9 Cir. 1948); Lincoln Restaurant v. Wolfie's Rest. Inc., 291 F.2d 302 (2nd Cir. 1961) and Ambassador East v. Shelton Corners, 120 F.Supp. 551 (S.D.N.Y.1954). Each of the names protected had been in use for many years, had been extensively promoted, and had become nationally or internationally famous. The Court observed in Stork Restaurant that the Stork Club had been described as "the best and most publicized nightclub in the entire world." 166 F.2d at 350. These cases declare that direct competition is not a prerequisite to infringe-

ment; they do not change the rule that distinctiveness must be shown in the relevant market, by secondary meaning if the name is descriptive.

## III.   ZONE OF EXPANSION

■ In some circumstances, a trademark will be protected not only in the area where it is known, but also in territories into which the mark will reach in the normal expansion of the business. Sweet Sixteen v. Sweet "16", 15 F.2d 920 (8th Cir. 1927); Burger King of Florida v. Brewer, 244 F.Supp. 293 (W. D.Tenn.1965); Food Fair Stores v. Food Fair, 177 F.2d 177 (1st Cir. 1949); White Tower System v. White Castle System, etc., 6 Cir., 90 F.2d 67; Restatement Torts, Sec. 732. The zone of expansion doctrine is usually dated from Hanover Star Milling v. Metcalf, 240 U.S. 403, 420, 36 S.Ct. 357, 363, 60 L.Ed. 713 (1916) in which the Court referred to "territory that would probably be reached by the prior user in the natural expansion of his trade." Plaintiff contends that its natural zone of expansion extends and that its name is entitled to protection throughout the Pacific Northwest, or at least to and including the Portland area.

Thorough briefs by both parties in this case make plain that the zone of expansion doctrine has a more than usually unclear place in the law of unfair competition. This is so because the doctrine is more than usually imprecise and yet very powerful. A weapon that usefully protects against trade pirates in an integrated, swiftly moving economy can easily range too far and be "inconsistent with the objectives of free competition." *Brincat,* supra. Application of the doctrine must, then, be sensitively founded in the particular facts and circumstances of the case. Abstract application or mechanical use would be dangerous, substituting a legal sledgehammer for a judicial scalpel.

As may be seen by close examination of the leading zone of expansion cases, each rests upon a finding of secondary

meaning or bad faith, or both. The trial court in Food Fair Stores, 177 F.2d 177, 185 (1 Cir. 1949) for example, had "categorically found on adequate evidence" that the plaintiff's name had acquired a secondary meaning among "an appreciable number of persons" in the claimed expansion zone. Sweet "16" had opened its infringing shop—despite a telegram of warning from plaintiff before the opening—seven years after plaintiff's successful and growing business had begun. The inference of bad faith was easily made. Furthermore, constant newspaper advertising over several years, mailing of catalogs to potential customers, and other promotion had given plaintiff's fanciful name a secondary meaning in the zone. See also, Shoppers Fair v. Sanders, 328 F.2d 496 (8th Cir. 1964).

■ With these distinctions in mind, I do not think the zone of expansion doctrine can assist Plaintiff in this dispute. Like the broad protection given in the restaurant cases discussed above, the doctrine is useful when the parties do not directly compete but, because of bad faith or other factors, denial of relief would be a denial of equity. I have concluded expressly that Plaintiff's name had no secondary meaning in Portland, the closest zone claimed as natural for expansion of the Seattle chain. Although Plaintiff did make some efforts toward expansion into Portland,[7] these were not by themselves sufficient to create secondary meaning. *Food Fair*. In addition, for reasons discussed below, I have concluded that Defendant is not guilty of bad faith.

## IV. PRIOR KNOWLEDGE

■ Plaintiff urges upon the Court "the significance of Defendant's knowledge of Plaintiff's prior use." Such knowledge is said to be a great wave upon the sea of unfair competition—determining results, expanding or demolishing geographic zones, and avoiding secondary meaning requirements. In effect, Plaintiff would have me conclude that because Defendant was aware of Plaintiff's existence I am to ignore all other equitable considerations in the delicate balancing of competitive interests. My responsibilities are more complex.

In this case, I find only knowledge. I do not, and upon the evidence could not, find that Defendant copied, appropriated, or pirated the name and ideas of Plaintiff. Two groups of entrepreneurs nearly simultaneously and quite independently conceived and carried out a clever and cleverly-named restaurant scheme.[8] Although Defendant is somewhat junior in opening dates, Defendant's initial planning—which would be indicative of any bad-faith desire parasitically to benefit from Plaintiff's success—was carried on without even an awareness of other similarly-named ventures. Where "knowledge" has had the sweeping power Plaintiff urges, it has been not just factual awareness but deliberate exploitation of another's business and reputation. Lincoln Restaurant v. Wolfie's, 291 F.2d 302 (2d Cir. 1961), Pike v. Ruby Foo's Den, 98 U.S.App.D.C. 126, 232 F.2d 683 (1956), Tisch Hotels v. Americana Inn, 350 F.2d 609 (7th Cir. 1965). Such exploitation is simply not to be found in this case. Moreover, even when an intent to capitalize upon another's efforts is clear, other factors such as Plaintiff's considerable reputation, heavy advertising, and arbitrary marks are often present. *Tisch Hotels*, supra. These too are not present.

## V. ANTI-DILUTION STATUTE

■ Having concluded that Plaintiff's allegations of trademark infringement and unfair competition are not

---

7. These were desultory at best—casual inquiries of a realtor as to sites, and printing a notice on customer checks, which presumably would pause only momentarily in the hands of the customers before they were returned to the files in Plaintiff's Seattle restaurants.

8. By simply removing "Roast" from the name already conceived and in use at the other side of the continent.

well-founded, I turn now to the claim under Oregon's Anti-Dilution Statute, ORS 647.107. The statute provides:

> *Grounds for injunctive relief.* Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under ORS 647.015, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

My earlier findings and conclusions are determinative of this claim as well. Plaintiff's name is not "a mark registered under ORS 647.015, or a mark valid at common law, or a trade name valid at common law." It is, therefore, not within the statute's cloak. Anti-dilution statutes are legislative answers to the second central question—has a protectable right been infringed?—and act only upon otherwise established rights. Since I have recently, in Airwick Industries v. Alpkem, 384 F.Supp. 1027 (D. Or.1974), canvassed this statute, extended discussion is unnecessary here.

## VI. LACHES

I come finally to Defendant's assertion that Plaintiff is guilty of laches. Because I have concluded that Plaintiff had no valid trademark, affirmative defenses need not necessarily be reached. Nonetheless, it may not be inappropriate to say a word or two about laches. Mere delay is not, of course, sufficient to bar Plaintiff's suit. Delay must result in prejudice to the Defendant. As the Seventh Circuit pointed out, "If this prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case." *Tisch Hotels,* supra, 350 F.2d at 615. Defendant Beef & Brew, however, relied upon Plaintiff's silence for far more than promotion. Its principals committed themselves to personal liability of more than $2.5 million. Defendant opened one restaurant after Plaintiff, having learned about Defendant's plans, voiced no warning nor even sent a query from Seattle to Portland. Defendant opened a second restaurant after Plaintiff had actually seen the first yet still sent no warning or query. In these circumstances, Plaintiff's delay in asserting its claimed rights should not be permitted to deprive Defendant of the goodwill it has created for its name in Portland. Responsible decisions as to the laches defense inevitably take into account other equitable points in the case: no fact is isolated. If Plaintiff's name had strong identification in Portland, or if Defendant had intentionally mimicked Plaintiff, or if Defendant had begun business many years after Plaintiff, in short, if the case were a different one, then perhaps laches would be an inappropriate defense. But I must decide *this* case, on all its facts, and I am satisfied that my central conclusion is proper.

Accordingly, Plaintiff's application for injunctive and monetary relief is hereby denied. Neither party shall recover costs.

This opinion shall serve as findings of fact and conclusions of law pursuant to F.R.Civ.P. 52.