The STOUFFER CORPORATION, Plaintiff,

v.

WINEGARDNER & HAMMONS, INC., et al., Defendants.

No. C–1–80–542.

United States District Court, S. D. Ohio, W. D.

Oct. 31, 1980.

Lawrence R. Elleman, Cincinnati, Ohio, for plaintiff.

Gerald L. Baldwin, Cincinnati, Ohio, for defendants.

## MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

SPIEGEL, District Judge:

This is an action for unfair competition in connection with the use of a service mark, commenced under 15 U.S.C. § 1125, and for unfair competition under the Ohio common law of trademarks and certain Ohio statutes. This Court's jurisdiction of the federal cause of action has been invoked under 15 U.S.C. § 1121 and 28 U.S.C. § 1338, with pendent jurisdiction over the Ohio unfair competitions causes of action.

This matter is presently before the Court on plaintiff's motion for a preliminary injunction. Plaintiff, by this motion, seeks to enjoin defendants from opening a restaurant in Blue Ash, Ohio, using the name "JOHN Q'S." Defendants filed a memorandum in opposition, and the motion for a preliminary injunction came on for hearing on October 22, 1980. On the basis of the testimony of a number of witnesses, the documents and exhibits offered and admitted into evidence, the arguments of counsel, and the subsequent filings of the parties, this Court, pursuant to Rule 52, Fed.R. Civ.P., makes the following findings of fact and conclusions of law.

Plaintiff, The Stouffer Corporation (Stouffer's) is an Ohio corporation with its principal place of business located in a suburb of Cleveland, Ohio. Defendant Winegardner & Hammons, Inc. (Winegardner & Hammons) is also an Ohio corporation. Its principal place of business is in Blue Ash, Ohio, a Cincinnati suburb. Defendant John Q's, Inc. is an Ohio corporation which also has its principal place of business in Blue Ash, Ohio.

John Q. Hammons (Hammons) is an individual who does business under the name John Q. Hammons Industries. He is a substantial shareholder and Chairman of the Board of Directors of Winegardner & Hammons, of which John Q's, Inc. is a wholly-owned subsidiary. Hammons also owns all of the stock of Glacier Western Corporation (Glacier Western), Plaza Catering Co., Inc. and Sequoia Catering Co., Inc.

At the present time there exist several restaurants in various parts of the country all bearing the name "John Q's." Hammons, through his various corporations, operates restaurants under this name in Everett, Washington; Visalia, California; and Sacramento, California. Stouffer's operates two restaurants called "John Q's," one in Chicago, Illinois, and one in Cleveland, Ohio. The particular "John Q's" which sparked this controversy, however, is one which is scheduled to open in Blue Ash, Ohio, in mid–November, 1980. This "John Q's" is owned, and will be operated, by the defendants through their various corporations, and will be located in the same building which houses the new principal offices of Winegardner & Hammons.

The manner in which each of the parties came to use the name "John Q's" is interesting. Stouffer's began to develop plans for the possible use of the name in mid 1975. The name was suggested by one of its employees, Mr. David Strasser. The name occurred to him because of the name of another Stouffer employee, Mr. John

Quagliata, who was also known as John Q. The Stouffer's restaurants were not named after Mr. Quagliata, however. The name was chosen because it was thought that the public would associate the restaurant with the colloquialism "John Q. Public."

Stouffer's opened its first restaurant under the name "John Q's" in December, 1976, in Pittsburgh, Pennsylvania. It opened a second "John Q's" in Philadelphia approximately three months later. In late 1977, Stouffer's opened a third "John Q's" in Chicago, Illinois, and in March, 1979 it opened a fourth restaurant by that name in Cleveland, Ohio. However, Stouffer's no longer operates the Philadelphia restaurant under the name "John Q's," and it ceased operation of the Pittsburgh restaurant under any name.

Similarly, one of Hammons' employees suggested to him that the name "John Q's," from his own name, be used for a restaurant that Glacier Western was planning to open in Everett, Washington. The decision to use the name was made in September of 1976. The restaurant opened under the name "John Q's" in May of 1977. Since that time, Glacier Western has opened two more restaurants under the same name, one in Sacramento, California in August of 1979 and one in Visalia, California, in April of 1980. In addition, Glacier Western has entered into licenses with Hammons, and various corporations in which Hammons has a substantial ownership interest, to operate restaurants using the name "John Q's" at specific locations in Denver, Colorado; Billings, Montana; Portland, Oregon; Wilsonville, Oregon; and, of course, Blue Ash, Ohio.

From the time that the name "John Q's" was conceived by the parties, each remained unaware of the fact of its use by the other until October 31, 1979. At that time, Mr. Eric Kamfjord, President of Winegardner & Hammons, became aware that Stouffer's was using the name "John Q's" in Cleveland through an advertisement in a trade publication. Stouffer's apparently became aware of Hammons' use of the name about that time as well. In November, 1979, counsel for Stouffer's notified Glacier Western that it should stop using the name because Stouffer's felt it had superior rights. Nonetheless, each of the parties arrived at their decision to use the name "John Q's" for their respective restaurants independently and in good faith.

A few days before Mr. Kamfjord learned that Stouffer's was also using the name "John Q's" in connection with a restaurant, Hammons, Roy Winegardner, and Kamfjord met and formally approved the written business plan for the Blue Ash restaurant which was to be called "John Q's." In December of 1979 construction of the building which was to house the restaurant began. This building also houses the main offices of Winegardner & Hammons. At the same time, promotion of the Blue Ash restaurant as "John Q's" began, including advertisements and articles in local newspapers and magazines.

Correspondence between counsel for the parties indicated that Stouffer's was aware that defendants planned to open a "John Q's" in Cincinnati as early as January, 1980; yet, they chose not to take any action regarding defendants' plans until one month before defendants' scheduled opening of the restaurant in Blue Ash.

The purchases of the real estate and construction of the Blue Ash building was financed by the issuance of industrial revenue bonds by the City of Blue Ash in the amount of $3,700,000. The payment of the principal and interest is to commence on November 1, 1980, in minimum monthly payments of $22,500 for the first 84 months of a twenty-eight year term. Defendants have incurred costs to date of $1,700,000 in furniture, fixtures and equipment for the Blue Ash restaurant, and their payroll for the restaurant as of October 24, 1980, is approximately $15,000 per week. In addition, defendants have made substantial expenditures for signs for the exterior of the building as well as for restaurant items such as menu covers, matchbooks, and superior quality specially designed napkins, china and glassware which bear the name "John Q's." Consequently, defendants

stand to suffer severe monetary loss should their restaurant not be permitted to open as scheduled.

By contrast, Stouffer's is merely contemplating the establishment of a John Q's in the Cincinnati area. It has never advertised, publicized or promoted the name "John Q's" in the Greater Cincinnati area for any restaurant owned or operated by it. Neither has it successfully registered the service mark "John Q's." Stouffer's did apply to register the mark, and Glacier Western has filed an opposition to its application.

The closest Stouffer's restaurant named "John Q's" is located in Cleveland, Ohio, approximately 240 miles from Cincinnati. Although Stouffer's Cleveland restaurant is extensively advertised in that city, and although it is located at a major crossroads for travelers, across from a major hotel and within walking distance of the Stadium, downtown theaters, and the convention center, there is no evidence that people from the Greater Cincinnati area have come to associate the name "John Q's" with a Stouffer operation, or that they would be confused should a "John Q's" open in this area under different management. The defendants have not acted with any intention to deceive or confuse the public or to "palm off" their services as those of Stouffer's, and such has not occurred. In fact, there is no evidence that the name "John Q's" is known at all in this area; thus, "John Q's" has acquired no secondary meaning here at this time.

What the Court finds has happened in this case is that two separate operations, plaintiffs' and defendants', have independently conceived of the name "John Q's" for use in connection with cocktail and restaurant services and operated restaurants under that name concurrently in separate parts of the country. As the parties have expanded their operations and come geographically closer to each other, each believing in good faith that it had the right to the name, a conflict regarding the use of the name was inevitable. Pending determination of which party has the right to use that

name in the Cincinnati area, Stouffer's has asked this Court to enjoin defendants from using the name "John Q's" here.

In support of its request for the injunction, Stouffer's maintains that it is likely to be successful on the merits by establishing that Cincinnati, Ohio, is within its normal zone of expansion, or, alternatively, that there would be a likelihood of confusion if defendants are permitted to open in the Cincinnati area. Its basis for these contentions is that since it is the first user of the name in Ohio, its normal zone of expansion extends to the entire state. Absent such a zone of expansion, plaintiff argues that it is likely that confusion will result should both parties use the same name for restaurant services in different areas of the state. The Court does not find these arguments persuasive.

First, there is no evidence of bad faith on defendants' part in their use of the name, and there has been no attempt by them to deceive or confuse the public by capitalizing on Stouffer's use of the name. The parties conceived and developed the use of the name independently and concurrently. Thus, for plaintiff to prevail on either of its arguments, it essentially must show a likelihood of confusion. *Coffee Dan's Inc. v. Coffee Don's Charcoal Broiler*, 305 F.Supp. 1210 (D.C.Cal.1969).

Factors to consider in determining whether confusion is likely are set out in *Coffee Dan's, supra* at 1213 and include the area of concurrent sale, the extent to which the goods are related, the similarity of the names each party seeks to use, evidence of bad faith, evidence of actual confusion, and the strength of novelty of the plaintiff's mark. The Court has already found no evidence of bad faith. Further, the areas of sale are sufficiently far apart that it can reasonably be expected that few, if any, people would patronize both Stouffer's "John Q's" in Cleveland and defendants' "John Q's" in Cincinnati. In fact, Stouffer's has made no showing as to what degree, if any, its Cleveland restaurant is patronized by people from the Cincinnati area. Likewise they have demonstrated lit-

tle to support a conclusion that actual confusion would exist. Stouffer's does not advertise its Cleveland "John Q's" or any "John Q's" in this area, and the general public here has no way of linking the name "John Q's" with Stouffer's.

On the other hand, the names of Stouffer's Cleveland restaurant and the defendants' proposed Blue Ash restaurant are the same. The style in which they are written is similar, although Stouffer's uses more than one style, while defendants' manner of displaying the name has been consistent. Both parties use the name in connection with restaurant and cocktail services that they offer. Stouffer's, however, has not established it as a "strong" or novel mark in the Cincinnati area. While the name could be categorized as somewhat fanciful, it nonetheless represents the name of an actual person. Thus, for Stouffer's to preclude defendants from using it here, it must show that defendants are using the name in bad faith or that it has acquired a secondary meaning in this area. *Anheuser Busch v. Bavarian Brewing Co.,* 264 F.2d 88 (6th Cir. 1959); *Crane Co. v. Crane Heating and Air Conditioning Co.,* 299 F.2d 577 (6th Cir. 1962); *beef & brew, inc. v. Beef & Brew, Inc.,* 389 F.Supp. 179 (D.C.Or.1974). Bad faith not being present, Stouffer's "John Q's" must be shown to have acquired a secondary meaning in this area, such that the public associates the name with plaintiff's restaurant services here for this area to be considered as within plaintiff's zone of expansion. *beef & brew, inc. v. Beef & Brew, Inc., supra* at 185. Yet, plaintiff has not demonstrated that its advertising, expansion, or reputation have extended beyond Cleveland, Ohio, in this state. Consequently, plaintiff has not established that its use of the name is entitled to protection here. *Wiener King, Inc. v. The Wiener King Corporation,* 192 U.S.P.Q. 353 (3d Cir. 1976); *Steak & Brew, Inc. v. Beef & Brew Restaurant, Inc.,* 370 F.Supp. 1030 (D.C.Ill. 1974); *Shoppers Fair of Arkansas, Inc. v. Sanders Co.,* 328 F.2d 496 (8th Cir. 1964). Therefore, plaintiff's argument that the Cincinnati area is within its zone of expansion and that permitting defendants' "John Q's" to open in this area would create confusion does not appear to this Court to have a very strong likelihood of success on the merits.

Moreover, in balancing the equities of this matter, it appears that the scales definitely tip in defendants' favor. Plaintiff already operates restaurants in this area, including "Zak's" and "Top of the Crown" and plans to open one soon in the Blue Ash area under the name "James Tavern." Stouffer's states that it had an opportunity to open a "John Q's" here as well, but has made no decision to do so at this point. Although Stouffer's was aware that defendants had definite plans for opening a restaurant by that name here for nine months prior to bringing this action, it waited until a month prior to the scheduled opening to assert what it believes are its rights.

In the meantime, defendants have made large expenditures and incurred heavy monetary obligations with every expectation that the opening of their "John Q's" would proceed on schedule. To enjoin them from opening at this date would cause them severe monetary hardship and other harm. Plaintiff, on the other hand, has shown little, if any, harm which would come to them should the defendants proceed. And, since the likelihood of confusion to the public by defendant's establishing a "John Q's" here is minimal, it appears that the public interest will not be harmed by either the granting or the not granting of an injunction.

Consequently, under the standard of *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537–538 (6th Cir. 1978), the Court finds that plaintiff has not established that injunctive relief is appropriate at this time. Plaintiff's motion for a preliminary injunction accordingly is denied.

So ordered.