## MAJOR LEAGUE BASEBALL PROPERTIES, INC. and Los Angeles Dodgers, Inc., Plaintiffs,

### v.

## SED NON OLET DENARIUS, LTD., d/b/a The Brooklyn Dodger Sports Bar & Restaurant, Bums, Inc., d/b/a The Brooklyn Dodger, David Senatore, Richard Picardi and Kevin Boyle, Defendants.

### No. 90 CIV 2170 (CBM).

United States District Court,
S.D. New York.

April 6, 1993.

planted this weapon in plaintiff's cell by answering plaintiff's four questions affirmatively.

Willkie Farr & Gallagher, New York City by Robert J. Kheel, William J. Borner, Stacey E. Blumberg, for plaintiffs.

Ronald G. Russo, Fischetti & Russo, New York City (John M. Keene and H. John Campaign, Graham, Campaign & McCarthy, P.C., New York City, of counsel), for defendants.

OPINION

MOTLEY, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

Plaintiffs, Major League Baseball Properties, Inc. ("Properties") and Los Angeles Dodgers, Inc. ("Los Angeles"), allege in their Amended Complaint [1] that the conduct of the three corporate defendants, Sed Non Olet Denarius, Ltd., d/b/a The Brooklyn Dodger Sports Bar and Restaurant ("SNOD"), BUMS, Inc., d/b/a The Brooklyn Dodger Sports Bar and Restaurant ("BUMS"), and 9506, Inc., d/b/a The Brooklyn Dodger ("9506") (hereinafter collectively "The Brooklyn Dodger"), and the conduct of the three individual defendants, David Senatore, Richard Picardi and Kevin Boyle, constitute: a) an infringement upon the rights of plaintiffs' trademarks in violation of 15 U.S.C. §§ 1114 and 1117; b) a wrongful appropriation of plaintiffs' trademarks in violation of 15 U.S.C. § 1125 c) a violation of plaintiffs' common law trademark and property rights; d) a violation of plaintiffs' rights under the New York General Business Law § 368–d; e) unfair competition; and f) the intentional use by defendants of a counterfeit mark in violation of 15 U.S.C. § 1117(b).

Each of these six causes of action is alleged to flow from defendants' use of the words "The Brooklyn Dodger" as the name and servicemark of the restaurants which defendants have operated in Brooklyn, New York, beginning in March 1988. Plaintiffs initially sought permanent injunctive relief, an accounting of profits, the destruction of physical items containing the allegedly infringing marks, monetary damages, and attorneys' fees.

By their Answer and Amended Answer defendants denied any infringement of plaintiffs' alleged right to use a "Brooklyn Dodger" trademark. Defendants also pleaded the defenses of abandonment by plaintiffs of any

---

1. On July 25, 1991 plaintiffs amended their complaint to name David Senatore, Richard Picardi, and Kevin Boyle, individually, as defendants.

"Brooklyn Dodgers" mark which plaintiffs may have owned at one time, as well as *laches*. The abandonment defense was premised upon the plaintiffs' failure to make any commercial or trademark use of the "Brooklyn Dodgers" name for at least 25 years after Los Angeles left Brooklyn in 1958. The *laches* defense was premised upon the fact that plaintiffs waited for more than a year and a half after learning of defendants' use of the allegedly infringing trademark before advising defendants of any alleged infringement. During this period defendants expended substantial resources and monies in establishing their restaurants in Brooklyn, New York. Defendants further pleaded the defense of unclean hands.

Finally, in their Amended Answer, defendants counterclaimed for the cancellation of various trademark registrations for "Brooklyn Dodgers" filed by plaintiffs after defendants' application to register the "Brooklyn Dodger" servicemark was filed on April 28, 1988.[2] These cancellations are sought on the ground that plaintiffs' registrations: a) falsely and deceptively suggest and imply a connection between plaintiffs and the Borough of Brooklyn which has not existed since 1958; b) inherently and directly misrepresent the origin of plaintiffs' goods and services as Brooklyn, New York when in fact this is untrue, in violation of 15 U.S.C. § 1052; and c) plaintiffs' use of a "Brooklyn Dodgers" mark suggests an association with defendants which does not exist, in violation of 15 U.S.C. § 1125(a).

On July 29, 1991, plaintiffs filed a motion for a preliminary injunction seeking to enjoin the use of the "Dodger" and "Brooklyn Dodger" name and defendants' logo in connection with the Canarsie establishment. (Tr. of 3/31/92 Hearing at 72; Tr. 707)

On March 31, 1992, the Honorable Kimba M. Wood of this court, to whom this case was then assigned, conducted a hearing. The parties submitted memoranda of law and affidavits in connection with the motion for a preliminary injunction. The court granted plaintiffs' motion for a preliminary injunction and enjoined defendants from using the mark the "Brooklyn Dodger" and the word "Dodger" written in standard athletic script as now used by defendants in connection with their third restaurant. (Tr. of 3/31/92 Hearing 69)

However, the court denied plaintiffs' application for summary judgment. Plaintiffs withdrew all claims for legal damages set forth in paragraph 4 of their Prayer for Relief, leaving only their equitable claims for injunctive relief (Prayer for Relief ¶ 1) and the destruction of all physical objects which make use of the "Brooklyn Dodger" mark (Prayer for Relief ¶ 3) and an accounting on their Lanham Act and common law claims. (*See* correspondence between counsel dated April 14, 16 and 17, 1992) (Tr. 2) Plaintiffs also seek an award of their attorneys' fees under the Lanham Act and common law. Following a preliminary hearing, a bench trial commenced on May 18, 1992 and continued until May 21, 1992. At the close of the trial the court reserved decision on all issues presented and requested that the parties submit proposed Findings of Fact and Conclusions of Law not later than July 17, 1992.

## II. FINDINGS OF FACTS

After hearing the evidence and weighing the testimony and exhibits received in evidence, as well as the credibility of the witnesses, the court makes the following findings of fact:

### A. *The Parties*

Plaintiff Properties is a corporation with offices and its principal place of business in New York, New York. It is the official trademark licensing, publishing, and marketing arm of the 26 Major League Baseball Clubs (the "Major League Clubs"). Properties is also charged with the responsibility of protecting the trademarks of these teams. (Trial Transcript "Tr." at 41)

Plaintiff Los Angeles is a corporation with offices and its principal place of business in Los Angeles, California. It is the owner of the Los Angeles Dodgers, a professional

---

2. In 1989, after this action had commenced, plaintiffs filed registrations for three different "Brooklyn Dodgers" marks. On July 7, 1992 plaintiffs filed to register a "Brooklyn" mark in athletic script.

baseball team which, since 1958, has played baseball in Los Angeles, California under the name the "Los Angeles Dodgers." (Plaintiffs' Exhibit "PX" 17) Prior to 1958 the same professional baseball team played baseball in Brooklyn, New York and were known as the "Brooklyn Dodgers" or the "Dodgers."

In 1958, the team moved the site of its home games from Brooklyn to Los Angeles. (Tr. 252–53) At that time, the corporation was known as the Brooklyn National League Baseball Club, Inc. which owned the Brooklyn Dodgers or the Dodgers. It pointedly changed its name to Los Angeles Dodgers, Inc. (Tr. 259–60) Since then the team known as the "Los Angeles Dodgers" has never played baseball in Brooklyn, New York. (Tr. 332).

By agreement with the Major League Clubs, Properties has been granted the exclusive right to market, license, publish, publicize, promote nationally, and protect the trademarks owned by the Major League Clubs, including those owned by the Los Angeles Dodgers. (Tr. 41, 52–53, 116–17)

Properties' licensing activities on behalf of the Major League Clubs have evolved and expanded over time. In the early 1980s, the Major League Clubs were responsible for licensing on their own, with some additional baseball-wide licensing provided by Properties. In the mid–1980s, by agreement with the Major League Clubs, all of the retail licensing activities of the Major League Clubs were consolidated within Properties. (Tr. 41–42)

Over 400 licensed manufacturers sell more than 2,500 different Major League Baseball licensed products. (Tr. 57) The range of products includes apparel, such as caps and T-shirts, trading cards, games, electronic items, novelties and accessories, and youth "Little League" merchandise.

In 1986, retail sales of licensed Major League Baseball merchandise were approximately $200 million. (PX 16 at 11) By 1991, retail sales of licensed Major League Baseball merchandise were in excess of $2 billion. (Tr. 55–56) Properties, however, receives only a royalty payment on the wholesale price of these products. (Tr. 55) After trial, in response to the court's request for information concerning the amount of sales attributable to commercial use of the "Brooklyn Dodgers" mark after 1981, plaintiffs responded that precise figures could not be provided. Specifically, plaintiffs stated:

> . . . Properties' records from the 1980s regrettably do not permit a precise breakdown of sales of goods bearing a specific trademark. As a result, figures representing sales of goods bearing the Dodgers' marks incorporating the word Brooklyn were, in most instances, subsumed within overall sales figures of merchandise bearing the Dodgers' marks, and not separately itemized. Recently, however, we have been accumulating more accurate records regarding sales of goods bearing individual Club trademarks. Based on this information and our general knowledge of our products, it is our best estimate that approximately $9 million worth of goods bearing the Dodgers' marks incorporating the word Brooklyn were sold in 1991. . . . we have contacted many of Properties' licensees, but unfortunately their records also do not permit us to obtain a more precise determination of annual retail sales during the 1980s of good bearing specifically the mark "Brooklyn Dodgers," separate and apart from retail sales of goods bearing the Dodgers' trademarks as a group.

(*See* Affidavit of Richard E. White, sworn Sept. 11, 1992 at 5–6)

In addition to its licensing and marketing efforts, Properties seeks to prevent infringement of the trademarks of the Major League Clubs. (Tr. 71–72)

Properties seeks to protect the Major League Clubs and retailers from unfair competition by counterfeiters, to ensure that consumers are not confused as to which products are authorized by the Major League Clubs, and to ensure that only safe, quality products reach consumers. (Tr. 73–74)

To enforce the trademark rights of the Major League Clubs, Properties relies on counsel, relies on the Clubs, polices and investigates the market itself, and relies on licensees. (Tr. 75) At times, Properties com-

mences litigation to prevent infringement at substantial expense. (Tr. 75–76)

Defendant SNOD is a corporation organized and existing under the laws of the State of New York and has its office and principal place of business at 7509 Third Avenue, Brooklyn, New York. (Tr. 480) On March 17, 1988 SNOD began doing business as a restaurant under the name "The Brooklyn Dodger Sports Bar and Restaurant." (Tr. 480)

Defendant BUMS was a corporation organized and existing under the laws of the State of New York and had an office and principal place of business at 360 Coney Island Avenue, Brooklyn, New York. On February 6, 1989 BUMS began doing business as a restaurant under the name "The Brooklyn Dodger Sports Bar and Restaurant." (Tr. 646) In November 1990, for reasons wholly unrelated to this litigation, BUMS ceased doing business as "The Brooklyn Dodger Sports Bar and Restaurant."

Defendant 9506 is a corporation organized and existing under the laws of the State of New York and has its office and principal place of business at 9505 Avenue L, Brooklyn, New York. (Tr. 384) On July 1, 1991, to replace the restaurant previously operated by BUMS, 9506 began doing business as a restaurant under the name "The Brooklyn Dodger Sports Bar and Restaurant."

All three corporate defendants, at various times during this litigation, have been engaged in providing restaurant and tavern services to the consuming public in Brooklyn, New York. This is the only business in which the defendants are engaged. (Tr. 383)

Defendant David Senatore is an owner of all three corporate defendants and assisted in forming the businesses. (Tr. 383) Defendant Richard Picardi is a resident of New York, New York, an owner of all three corporate defendants and assisted in forming the businesses. (Tr. 383) Defendant Kevin Boyle is a resident of Brooklyn, New York, an owner of BUMS and 9506 and assisted in forming all three businesses. (Tr. 383) These businesses were to be the livelihood of Senatore, Picardi, and Boyle. (Tr. 521, 623, 706)

## B. *The Brooklyn Dodger Restaurants*

In 1987, the individual defendants, together with Brian Boyle, defendant Kevin Boyle's brother, decided to open a restaurant in Brooklyn, New York. (Tr. 483, 516–517, 599–600, 740).

It was the individual defendants' decision that their restaurants would emphasize the multiple themes of fun, sports and Brooklyn. Their intention was to create a nostalgic setting where Brooklynites could relax and reminisce about times gone by. (Tr. 526, 534, 607, 742; DX C)

They initially chose to name their establishment "Ebbets Field" after the former baseball park located in Brooklyn, New York in which a baseball team know as the "Brooklyn Dodgers" played baseball until October, 1957. (Tr. 499, 518, 601, 740–41)

To assure themselves that the use of this name would not conflict with any other person's use of it, the individual defendants commissioned a trademark search for the name "Ebbets Field" in April, 1987. (Tr. 518, 522, 602, 741; DX U) Although this search established that no trademark registration for "Ebbets Field" had been filed, the individual defendants learned that a small restaurant, not unlike the one they hoped to open in Brooklyn, was operating in Hicksville, New York. (Tr. 524, 604–605, 741–64)

In light of this fact, and in an attempt to avoid any possible legal entanglements, the individual defendants chose not to use the name "Ebbets Field" and continued their search for another name. (Tr. 520, 525–26, 561, 607, 646–47, 765)

The individual defendants were aware that there once was a baseball team known as the "Brooklyn Dodgers" which had once played in Brooklyn, New York. Defendants also knew that in 1958 that team left Brooklyn and relocated to Los Angeles, California.

The defendants knew that the departure of the "Brooklyn Dodgers" in 1958 had been accompanied by monumental hard feelings in the Borough of Brooklyn. In fact the relocation was one of the most notorious abandonments in the history of sports. (Tr. 527, 563) At the time defendants selected their logo, they were aware that Los Angeles owned

federal trademark registrations for the word "Dodgers." (Tr. 492, 562, 659, 735–36) However, at no time during their consideration of the "Brooklyn Dodger" name did the individual defendants have any reason to believe that "The Brooklyn Dodger" mark was being used by Los Angeles, and certainly not for restaurant or tavern services. (Tr. 526–27) When considering the use of the "Brooklyn Dodger" mark, at no time was there any discussion among the individual defendants and Brian Boyle about trading on the goodwill of Los Angeles in Brooklyn. (Tr. 528) Indeed, non-party witness Brian Boyle, a life-long Brooklyn resident, testified that, given the acrimonious abandonment of Brooklyn by Los Angeles, the idea of trading on Los Angeles' "goodwill" in Brooklyn is almost "laughable." (Tr. 529)

Nevertheless, acting in good faith, the individual defendants, again desirous of avoiding any legal entanglements, commissioned yet a second trademark search, this one for the name "Brooklyn Dodger" in October, 1987. (Tr. 489, 609–11, 621–22, 744; PX 28) While defendants were aware at the time they selected their logo that Los Angeles owned federal trademark registrations for the word "Dodgers,"[3] their second trademark search established that no registration of any "Brooklyn Dodger" mark had ever been filed. (Tr. 492, 532, 562, 659, 735–36; PX 28)

Accordingly, in October, 1987 the individual defendants formed the corporate defendant SNOD for the purpose of operating a restaurant. SNOD began doing business with the public on March 17, 1988 as "The Brooklyn Dodger Sports Bar and Restaurant." (Tr. 480)

Having invested the time, money, and effort in founding this restaurant and having exercised all reasonable diligence to satisfy themselves that no one was using a "Brooklyn Dodger" trademark for restaurant and tavern services, and that no one had filed a registration for this trademark for use in any other field, the principals of SNOD sought to protect their interests in their new name. (Tr. 571) Accordingly, on April 28, 1988, an application to register a composite design mark incorporating the term "The Brooklyn Dodger" as a servicemark for restaurant and tavern services was filed with the United States Patent and Trademark Office in Washington, D.C. (Tr. 571, 630, 637, 728; PX 37)

### C. Defendants' Use of the Trademark

In connection with each of defendants' "The Brooklyn Dodger" restaurants, defendants make and/or made prominent use of the "Dodger" name and the "Brooklyn Dodger" name, with the word "Dodger" in stylized script, in the color blue, and in blue script. (PX 40 at 1, 27, 31–37, 41–44)

The defendants' composite design mark consisted of three words: "The," "Brooklyn" and "Dodger" are entwined with one another and with an impish character, designed by Lincoln Peirce, which was styled after the Charles Dickens' character, the "Artful Dodger" from the novel *Oliver Twist*, leaning against the "r" in "Dodger." (Tr. 165; PX 37, 38) Defendants, however, make significant use of their logo without the cartoon character to promote their business, including on merchandise such as apparel, in advertisements, on their letterhead and as part of their servicemark. (PX 32, 33 at 1, 34, 35; DX V; Tr. 674–79)

Defendants' logo is similar to Los Angeles' trademarks. The name "Brooklyn Dodgers" is similar to the name "Brooklyn Dodgers" as

---

**3.** No fewer than eleven Dodgers' trademarks are presently federally registered with the United States Patent and Trademark Office. (PX 2) While some of these marks were registered within the last three years, the mark Dodgers and the mark Dodgers in the distinctive Dodgers script were initially federally registered as early as 1967. (PX 2 at 23)

Los Angeles ranks consistently among the top Major League Clubs in terms of retail sales of licensed merchandise bearing their trademarks. In 1991 alone, Properties *estimates* that $100 million worth of goods bearing Los Angeles' trademarks were sold. (Tr. 77–78, 90–91) Defendants' own expert testified that "[w]e don't dispute as far as I understand, certainly I don't dispute that Los Angeles Dodgers is a well-know name. Brooklyn Dodger is probably still to some degree a well-known name." (Tr. 421) Defendants' counsel similarly represented during trial that defendants "certainly have never contested and concede the popularity of the Los Angeles Dodgers baseball team." (Tr. 254)

used by plaintiffs. The script used by the defendants in their logo is similar to that used in Los Angeles' trademarks. The color blue used by defendants is similar to the color blue used by and associated with Los Angeles' sports club in Brooklyn. The swash or tail of the word "Dodger" used by defendants is similar to that used in Los Angeles' trademarks in terms of style and length. (PX 2, 3, 58 at 2, 53 at 69; Tr. 227, 319, 430, 673–74, 682, 759)

The similarity of the parties' marks is further evidenced and emphasized by the fact that defendants use their logo in a sports-oriented atmosphere containing numerous references to baseball and the Brooklyn Dodgers. (*See* PX 40)

The similarity of defendants' logo to Los Angeles' trademarks as used prior to 1958 is further evidenced and emphasized by the fact that defendants, in selecting their name and creating their logo, intended to allude to the Brooklyn Dodgers baseball club and to track the script used by the Brooklyn Dodgers. (Tr. 486–89) Indeed, virtually every witness at trial, including the artist who designed defendants' logo and defendants' expert witness, testified to the similarity of the marks. (Tr. 115, 148–58, 167, 319, 430–31, 486–87, 569, 667–68, 684, 759; PX 53 at 69)

In selecting their logo, defendants intentionally sought to reproduce the Brooklyn Dodgers' trademarks. Indeed, the script for the defendants' logo was intentionally chosen by defendants to track the script used by the Brooklyn Dodgers. As one of defendants' former principals testified:

Q: ... The script for the Dodger restaurant, the Brooklyn Dodger restaurant, the script, that tracks that of the Brooklyn Dodger baseball team, doesn't it?

A: Yes.

Q: And that was intentional, wasn't it?

A: I imagine so ... We wanted a reference to the Brooklyn Dodgers baseball team, yes. (Tr. 569)

Defendants' cartoon character was intentionally selected to allude in part to the famous "Brooklyn Bum" character associated with the Brooklyn Dodgers. (Tr. 487–89; *compare* PX 40 at 6 (The Brooklyn Dodger bum) *with* PX 11 at 6 (the Brooklyn Dodgers bum)) In selecting their name, logo and cartoon character, defendants were intentionally alluding to the Brooklyn Dodgers. (Tr. 486–89, 569, 688) However, rather than tracing the allegedly infringing mark "Dodger" from any exemplar, Peirce testified quite clearly that "I drew it freehand. I drew it, I outlined it in a pen, a felt-tipped pen, and I think I colored it in." (Tr. 165) Peirce was paid $100.00 for his services. (Tr. 165, 684–86; DX J)

The exteriors of defendants' bars have signs and awnings bearing the Brooklyn Dodger logo. The "Dodger" portion of the sign outside of the Bay Ridge Brooklyn restaurant is in blue script with the "r" in the word "Dodger" continuing in a "swash" or tail which underlines the word "Dodger." (PX 40 at 1; Tr. 384)

Defendants and their employees wear or have worn shirts with defendants' "Brooklyn Dodger" logo or with "Dodger Staff" printed on them, the "Dodger" portion being in stylized script similar to Los Angeles' trademark for the mark Dodgers in cursive script. Defendants had these shirts designed and manufactured for their restaurants. (PX 31, 53 at 87, 54 at 94; Tr. 384–85) Defendants' sell and have sold or distributed apparel, including T-shirts and caps, bearing the name "Brooklyn Dodger." (PX 40 at 9; Tr. 386) Defendants have also sold or given to patrons bumper stickers and gift certificates bearing the "Brooklyn Dodger" logo. (Tr. 387)

Defendants have used the word "Dodger" alone without the word "Brooklyn" on merchandise, such as apparel bearing the logo "Dodger Staff," and on food products to promote their business, such as "Dodger Blue" Cheese, "Deep Dish Dodger" pizza, "Dodger Seafood Chowder," ribs with "Dodger Sauce," "Dodger Pee–Wee" pasta, and "The Duke" and "The Furillo" hamburgers (references to former Dodgers Pee Wee Reese, Duke Snider, and Carl Furillo). (PX 14, 31, 53 at 87, 54 at 94; Tr. 311, 385, 482, 654) Defendants also sell food products referring to the "bum" character associated with the Brooklyn Dodgers, such as "Bum's House Salad." (PX 14)

There is a replica of a Brooklyn Dodgers jersey and cap displayed inside defendants' restaurant. (PX 40 at 4) A baseball bat used by Brooklyn Dodgers player Jackie Robinson and baseballs autographed by Brooklyn Dodgers players are also displayed in defendants' restaurant. (PX 40 at 5; Tr. 386) A wall-sized mural of Ebbets Field, the Brooklyn ballpark of the Brooklyn Dodgers, dominates one wall in defendants' restaurant. (PX 40 at 5; Tr. 386) Photographs of Los Angeles and Brooklyn Dodgers players and newspaper articles referring to the Brooklyn Dodgers are displayed throughout defendants' restaurant. (PX 40) Defendants decorate their restaurant with cartoons depicting the "bum" character associated with the Brooklyn Dodgers. (PX 40 at 4, 6)

Defendants' menus and placemats reference the names of Brooklyn Dodgers players and the word "Dodger." (PX 14; Tr. 311, 385, 482, 654) Defendants have disseminated to the public corporate checks identifying the drawer as "The Brooklyn Dodgers" (with the "s"). (PX 45 at 4; Tr. 387, 389, 652–53)

Defendants have caused to be published a newspaper advertisement referring to their establishments as "The Brooklyn Dodgers" (with the "s"). (PX 34)

In February 1989, the individual defendants, through a second corporate defendant, BUMS, Inc., opened a second "The Brooklyn Dodger Sports Bar and Restaurant" on Coney Island Avenue, not far from defendants' initial establishment. The same logo and servicemark were used with respect to this restaurant.[4]

## D. *Plaintiffs' Use of the Trademark*

Upon relocating its franchise to Los Angeles, California, plaintiff Los Angeles changed its corporate name from the "Brooklyn National Baseball Club, Inc." to "Los Angeles Dodgers, Inc." and began playing baseball under the same name. Of the 26 baseball teams currently playing baseball, no team plays under the name the "Brooklyn Dodgers." The only Dodger team currently playing baseball is the "Los Angeles Dodgers" (PX 17) which is the name the team has played under since its departure from Brooklyn in 1958. (Tr. 563)

Plaintiffs' use of the "Brooklyn Dodgers" mark was based upon its physical location, until October 1957, in Brooklyn, New York. However, in 1959, Los Angeles made prominent commercial use and reference to their Brooklyn heritage and trademarks in connection with the promotion of Roy Campanella Night, honoring the former Brooklyn Dodgers player and present employee. (Tr. 94–96, 266–67; PX 1 at 2, 22) Los Angeles made prominent use of their trademarks incorporating the word "Brooklyn" at their annual oldtimers games. (PX 1 at 37, 40; Tr. 270) Oldtimers games are commercial baseball exhibitions at which former players are honored and perform so that older fans can recall the past and younger fans can learn about the history of the Club. (Tr. 267–68)

In 1966, Los Angeles sent a cease and desist letter to a member of the Continental Football League to prevent it from infringing Los Angeles' trademark by calling itself the Brooklyn Dodgers. (PX 8; Tr. 287–89)

Since approximately 1967, Los Angeles has licensed manufacturers of hot dogs to sell a hot dog known as the Dodger Dog using the Los Angeles' trademarks (without the "s"). (PX 12, 13; Tr. 305–08) The wrapper for the Dodger Dog bears the word "Dodger" in blue script and is underlined. (PX 13A; Tr. 308) Other uses of the "Dodger" trademark by Los Angeles include the authorization of Aloma, Inc. to use Los Angeles' trademarks in the operation of the Dodger Pines Golf and Country Club, including its restaurant facilities. (PX 10, 11; Tr. 298) Displayed in that restaurant are an array of sports photographs and memorabilia referring to the Los Angeles Dodgers, including their Brooklyn

---

4. In November 1990, for reasons unrelated to this litigation, defendants closed the restaurant operated by BUMS, Inc. In June 1991 the individual defendants, after consulting with trademark counsel (Tr. 660, 729), through defendant 9506, opened a restaurant on Avenue L in Brooklyn under the name "The Brooklyn Dodger Sports Bar and Restaurant" to replace BUMS' establishment. By Order of the court (Wood, J.) dated March 31, 1992 defendants were preliminarily enjoined from the use of the "Brooklyn Dodger" mark at 9506's restaurant, although not at SNOD's, pending this court's decision.

history, such as a photograph of Ebbets Field and a pennant depicting the "bum" associated with the Brooklyn Dodgers. (Tr. 302–03; PX 11)

Los Angeles authorizes the Dodgertown Conference Center, located at the Los Angeles Dodgers' Spring training facility in Vero Beach, Florida, to use Los Angeles' trademarks to decorate a cafeteria and lounge. (PX 11; Tr. 298) Displayed in those facilities are sports photographs and memorabilia referring to the Los Angeles Dodgers, including their Brooklyn history. (PX 11; Tr. 302–03) Los Angeles has authorized the concessionaire at Dodger Stadium to decorate a restaurant, bar, and meeting facility called The Stadium Club at Dodger Stadium with photographs and/or paintings of Brooklyn Dodgers players. (Tr. 297) A restaurant owned by Bobby Valentine, manager of the Texas Rangers baseball club, is also authorized to use the trademarks of certain Major League Clubs. (Tr. 108)

One document which covered calendar year 1977, established that there was a licensing agreement between Major League Baseball Promotion Company, the predecessor to Properties, and a third party which was licensed to use the names, symbols, and logos of all major league baseball teams including "Los Angeles Dodgers." (DX F) No reference to the "Brooklyn Dodgers" is made in this agreement. However, on April 6, 1981, this licensing agreement was amended to include the name, symbols, logos, etc. of The "Brooklyn Dodgers" as well. (PX 19) Despite voluminous discovery in this case, at trial this document was the earliest licensing use of the "Brooklyn Dodger" name, following Los Angeles' departure from Brooklyn.

While plaintiffs have from time to time made use of their former "Brooklyn Dodgers" mark occasionally and sporadically for historical retrospective such as "Old Timer's Day" festivities, the documentary proof establishes that, following its departure from Brooklyn, Los Angeles' earliest licensing of the "Brooklyn Dodgers" mark occurred on April 6, 1981. (PX 19)

Between 1981 and March 17, 1988, the date of defendants' first use of their mark for restaurant and tavern services, plaintiffs used their "Brooklyn Dodgers" mark for a variety of purposes. Those uses were almost exclusively in the context of T-shirts, jackets, sportswear, sports paraphernalia and on various types of novelty items (i.e. on drinking mugs, cigarette lighters, pens, Christmas tree ornaments, wristbands, etc.). (PX 2, 16) However, none of these uses competes with defendants' use of the mark for restaurant and tavern services.

In 1981, plaintiffs licensed Eastport manufacturing Co. to merchandise T-shirts bearing, *inter alia*, the Brooklyn Dodger named and logo. (PX 19; Tr. 79–81)

In 1984, Los Angeles agreed to permit Martin Dorf to use photographs of the Brooklyn Dodgers as wall decorations in a restaurant in New Jersey called Burger Boys of Brooklyn. (PX 4; Tr. 78–79)

In 1985, Los Angeles authorized United Airlines to broadcast radio commercials which referred to the Brooklyn Dodgers. (PX 6; Tr. 282)

In 1986, Los Angeles agreed to license the Bank of New England to run an advertisement using the Los Angeles' trademarks incorporating the word "Brooklyn." (PX 5; Tr. 281) In 1986, Los Angeles entered into an agreement with Oxford University Press to permit them to use Los Angeles' trademarks incorporating the word "Brooklyn" in connection with a book. (PX 7; Tr. 283) In 1986, plaintiffs authorized Trench Manufacturing Co. to sell various items of merchandise bearing, *inter alia*, the Los Angeles' trademarks incorporating the word "Brooklyn." (PX 20; Tr. 82)

In March 1987, plaintiffs and Roman Art Embroidery Corp. entered into a licensing agreement to manufacture and sell caps bearing, *inter alia*, Los Angeles' trademarks incorporating the word "Brooklyn." (PX 21; Tr. 83–84)

In approximately 1986, Properties began promoting Los Angeles' trademarks incorporating the word "Brooklyn" together with other "oldtimer" trademarks of Major League Clubs (that is, trademarks that had not been worn on the playing field for at least five years) under the name "the Coo-

perstown Collection." (Tr. 83–86; *see also* PX 18)

Los Angeles licensed the use of their marks incorporating the word "Brooklyn" in connection with the television series "Brooklyn Bridge." (Tr. 296–97) Los Angeles licensed the Brooklyn Dodgers Hall of Fame, located in Brooklyn, to use Los Angeles' trademarks incorporating the word "Brooklyn." (Tr. 296–97)

Defendants did not select the name "The Brooklyn Dodger" for their restaurant until sometime after October 14, 1987, and did not open their first bar and restaurant using their "Brooklyn Dodger" logo until March 1988. (Tr. 383, 480, 490–91, 541, 621)

While plaintiffs placed in evidence various uses of the "Brooklyn Dodgers" mark, such as photo permissions in 1984 (PX 4, 5), a permission for use on United Airlines Radio Commercials (PX 6) and a permission to use the Brooklyn "B" in conjunction with a written history of the Brooklyn Dodgers baseball team (PX 7), such uses, granted, for minimal or no compensation, do not constitute trademark uses as is discussed more fully in the court's Conclusions of Law. Similarly plaintiffs attempt to prevent a third party from using the "Brooklyn Dodgers" mark in 1966 (PX 8) is not a trademark use; neither did these uses involve restaurant and tavern services.

With respect to restaurant and tavern services, the evidence established that while the "Brooklyn Dodgers" were playing baseball in Brooklyn, there existed, also in Brooklyn, a restaurant and tavern which used the name "Dodgers Cafe." (DX K) The logo of this establishment was the word "Dodgers," in script, with the figure of a swinging baseball batter. (DX L) The evidence shows that the "Dodgers Cafe" began operating with a State Liquor Authority license in 1942 and continued to operate until 1968, long after Los Angeles had left Brooklyn. Plaintiffs conceded that they took no step whatsoever while they were playing baseball in Brooklyn, or after they had relocated to Los Angeles, to cause the "Dodgers Cafe" to cease using the name as its servicemark for its restaurant.

### E. *Timing of the Litigation*

In September, 1987 at approximately the same time that the trademark search for the name "The Brooklyn Dodger" was being conducted, defendant Boyle wrote a letter to Peter O'Malley, the President and part owner of Los Angeles, seeking O'Malley's best wishes "for the new business" which Boyle advised O'Malley he was about to open in Brooklyn. (Tr. 609–11)

In July 1988, plaintiff Los Angeles discovered defendants' use of the Brooklyn Dodger logo when plaintiff received a copy of the menu of defendant SNOD bearing the allegedly infringing mark. (Tr. 310; PX 14) This menu was sent to Los Angeles by defendant Boyle. (Tr. 631–32, 643) Although finding the allegedly infringing mark to be "a serious concern" (Tr. 345–46), on July 20, 1988 Los Angeles sent the menu bearing the allegedly infringing mark to Properties for further action, asking Properties to investigate the potential infringement of Los Angeles' trademarks but asking Properties to consider, before taking any enforcement action, the potential for negative publicity to the Los Angeles Dodgers. (Tr. 115–16, 346; PX 55; *see* Tr. 114, 319) Los Angeles took this action pursuant to the agreement between the Major League Clubs and Properties. Neither plaintiff Los Angeles nor plaintiff Properties chose to do anything further about the alleged infringement until April 24, 1989. (Tr. 361; PX 15)

As defendants' success in their new venture grew, they sought to take additional legal steps to protect their mark. Accordingly, on August 9, 1988 the composite design mark at issue, containing the term "The Brooklyn Dodger" was registered as a servicemark with the Secretary of State of the State of New York, yet again giving notice of defendants' interest in the name. (Tr. 555–56, 643; DX V)

In approximately February 1989, notice of defendants' attempt to register their logo with the United States Patent and Trademark Office was first officially published. (Tr. 494)

On April 24, 1989, fully nine (9) months after receipt by plaintiff Los Angeles of the

menu sent by Boyle, plaintiffs wrote to defendants and claimed for the first time that the defendants' conduct was allegedly infringing their trademark and demanding that they cease and desist from any acts of infringement. (Tr. 318, 383, 646; PX 15 at 1–2)

From April 1989 to March 1990, there were periodic conversations during which the parties attempted unsuccessfully to resolve the dispute. (Tr. 319) When those efforts failed, plaintiffs filed their complaint in March 1990.

In June 1991, while this litigation was pending, counsel for plaintiffs learned during discovery that defendants had formed 9506 to open yet another establishment calling itself "The Brooklyn Dodger Sports Bar and Restaurant" in a new neighborhood in Brooklyn. Within days of that discovery, counsel for plaintiffs delivered to counsel for defendants a letter demanding that defendant cease and desist. (PX 15 at 3; Tr. 383) Defendants nevertheless chose to open another establishment in the Canarsie section of Brooklyn. (Tr. 704–06)

In July 1991 plaintiffs field their amended complaint. In March 1992 Judge Wood granted plaintiffs' motion for preliminary injunction concerning the Canarsie establishment but denied plaintiffs application for summary judgment. This court concluded trial of this matter in May 1992.

## III. CONCLUSIONS OF LAW

### A. *Jurisdiction*

This court has jurisdiction over the subject matter of each of the plaintiffs' causes action pursuant to 28 U.S.C. §§ 1331, 1338 and 15 U.S.C. § 1121 and principles of pendent jurisdiction, and consequently also has jurisdiction over the parties and over defendants' pleaded defenses and counterclaims.

### B. *Plaintiffs' Federal and Common Law Causes of Action*

■■■ In order to obtain relief for common law trademark infringement or violations of the Federal Trademark Act ("the Lanham Act") for trademark infringement,[5] or for false representation of goods, or false designation of origin, and wrongful appropriation of plaintiffs' trademarks,[6] plaintiffs were required to prove by a fair preponderance of the credible evidence either actual confusion or a likelihood of confusion.[7]

5. 15 U.S.C. § 1114 provides in pertinent part:
 Any person who shall, without the consent of the registrant, ... (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.
 15 U.S.C. § 1117 provides in pertinent part: When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action....
 Plaintiffs withdrew their claim, under Paragraph 4 of their Prayer for Relief for an Order, pursuant to 15 U.S.C. § 1117, concerning damages, including treble damages together with a reasonable attorneys' fee, in an amount presently not determinable, as well as the costs, fees and disbursements of the action.

6. 15 U.S.C. § 1125 provides in pertinent part:
 Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same ... shall be liable to a civil action by ... any person who believes that [he or she] is or is likely to be damaged by the use of any false description or representation.

7. As part of their remedy, plaintiffs seek the destruction of all physical objects which make use of the "Brooklyn Dodgers" mark. 15 U.S.C. § 1118 provides:
 In any action arising under this chapter, in which a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established, the court may order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of the defendant, bearing the registered mark or any reproduction, counterfeit copy, or colorable imitation

*W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 571 (2d Cir.1993). In order to secure injunctive relief or other equitable relief, plaintiffs were required to prove a likelihood of confusion. Had plaintiffs sought to secure damages, they would have been required to prove actual confusion. *See W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 808 F.Supp. 1013, 1020–21 (S.D.N.Y. 1992), *aff'd,* 984 F.2d 567 (2d Cir.1993). Thus, as to the likelihood of confusion, Los Angeles and Properties must show that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source" of the services provided by the defendants because of their use of the words "The Brooklyn Dodger" in conjunction with their restaurants in Brooklyn. *W.W.W. Pharmaceutical,* 984 F.2d at 571 (*quoting Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) *quoted in McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130 (2d Cir.1979)).

■ This court finds and concludes that plaintiffs have failed to prove either actual confusion or likelihood of confusion stemming from defendants' trademark "The Brooklyn Dodger" even though it is similar to the "Brooklyn Dodgers" trademark that plaintiffs held as a sports club in Brooklyn.

■ In determining whether a plaintiff has proven likelihood of confusion, the courts of this Circuit follow and apply to the evidence the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). "The [*Polaroid* ] factors are designed to help grapple with the 'vexing' problem of resolving the likelihood of confusion issue." *W.W.W. Pharmaceutical,* 984 F.2d at 572 (*quoting Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir.1986) (citation omitted)). These factors are:

a) strength of plaintiff's trademark,

b) similarity between the trademark used by the parties,

c) proximity of the products,

d) the likelihood that plaintiffs will "bridge the gap,"

e) actual confusion,

f) good faith or intent of the defendant,

g) quality of defendants' services,

h) sophistication of purchasers.

This court finds only factors a) and b) in favor of plaintiffs. However, "[t]his list of factors does not exhaust the possibilities—the court may have to take still other variables into account. American Law Institute, Restatement of Torts §§ 729, 730, 731." *W.W.W. Pharmaceutical,* 984 F.2d at 572 (*quoting Polaroid Corp.,* 287 F.2d at 495).

1. Strength of the Mark

■ The strength of the mark is determined by "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *W.W.W. Pharmaceutical,* 984 F.2d at 572 (*quoting McGregor–Doniger,* 599 F.2d at 1131). A mark's strength, which turns on its " 'origin-indicating' quality in the eyes of the purchasing public," *W.W.W. Pharmaceutical,* 984 F.2d at 572 (*quoting McGregor–Doniger,* 599 F.2d at 1131), is determined by two factors: "(1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." *W.W.W. Pharmaceutical,* 984 F.2d at 572 (*quoting McGregor–Doniger,* 599 F.2d at 1131–33).

Courts have used four categories in measuring the distinctiveness of a mark: generic, descriptive, suggestive, and arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). "A generic mark is generally a common description of goods and is ineligible for trademark protection. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. A

---

thereof, and all plates, molds, matrices, and other means of making the same, shall be

delivered up and destroyed.

suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use 'imagination, thought and perception to reach a conclusion as to the nature of the goods....' Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and 'with ease of establishing infringement.'" *W.W.W. Pharmaceutical,* 984 F.2d at 572 (citations omitted).

In assessing the strength of a mark outside its field, "coined" marks, such as "Xerox" or "Kodak," are considered the strongest marks and are accorded the highest degree of trademark protection. *See Landers, Frary and Clark v. Universal Cooler Corp.,* 85 F.2d 46, 48 (2d Cir.1936). Marks incorporating words of common English usage are not accorded the same degree of protection as "coined" terms. The Court of Appeals for the First Circuit has explained the basis for this generally-accepted legal maxim:

> We do not think a trader can pluck a word with favorable connotations [Esquire] for his goods or services out of the general vocabulary and appropriate it to his exclusive use no matter how much effort and money he may expend in the attempt.

*Esquire Inc. v. Esquire Slipper Manufacturing Co.,* 243 F.2d 540, 543 (1st Cir.1957)

Unlike the case with "coined" or arbitrary words, the courts have consistently held the common English words, even if used arbitrarily in application to a user's services, are of weak trademark significance outside their field of operations. *See, e.g., Sun Banks of Florida v. Sun Federal Savings and Loan,* 651 F.2d 311, 316 (5th Cir.1981) ("sun" of weak trademark significance).

Even if there was a greater proximity of the parties' service lines, the name "Dodgers" would still not receive the protection plaintiffs here seek. The courts have demonstrated a reluctance to grant a user or holder of a mark which consists of a word of common English usage, even a word less commonly used than "dodgers," a monopoly on that term outside its field. *See e.g., Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1027 (2d Cir. 1989) (court declined to find "Lexis" a strong mark outside its field due to its common use in the English language).

While the "Brooklyn Dodgers" mark, used by Los Angeles before it left Brooklyn, is not arbitrary or fanciful, its strength as the name of a nationally known sports team was more than just generic or descriptive. With respect to the precise issue presented here—the strength of the trademarks of a sports franchise—the Fifth Circuit Court of Appeals has noted: "Nearly everyone is familiar with the artistic symbols which designate the individual teams in various professional sports." *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1008 (5th cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). *See National Football League Properties, Inc. v. New Jersey Giants, Inc.,* 637 F.Supp. 507, 517 (D.N.J.1986) ("the NFL Marks ... are extremely strong, ... and, accordingly, are entitled to a wide range of protection").

Los Angeles' mark was suggestive, the strength of the mark and the suggestiveness of the mark derived from the use of two common English words together. *See W.W.W. Pharmaceutical,* 984 F.2d at 572. The words "Brooklyn" and "Dodgers" together "make up a composite more distinctive than the sum of its parts." *W.W.W. Pharmaceutical,* 984 F.2d at 572. As opposed to considering the word "Brooklyn" or the word "Dodgers" alone, the imaginative mind could consider "Brooklyn Dodgers" as connotative of a sports club in Brooklyn, as is required of suggestive marks.

The public undoubtedly identified the mark "Brooklyn Dodgers" with the Brooklyn-based baseball team. To that extent, the mark was strong and deserving protection.

2. Similarity Between the Trademarks Used by the Parties.

In determining the similarity of the mark, the test is "whether the similarity of the marks is likely to provoke confusion among potential customers." *W.W.W. Pharmaceutical,* 984 F.2d at 573; *McGregor–Doniger,* 599 F.2d at 1133. For this factor, the court looks to "the general impression created by the marks, keeping in mind all factors

which the buying public will likely perceive and remember." *W.W.W. Pharmaceutical,* 984 F.2d at 573; *McGregor-Doniger,* 599 F.2d at 1133.

The defendants' "The Brooklyn Dodger" mark is clearly similar to the "Brooklyn Dodgers" mark used by Los Angeles as a Brooklyn sports club. The blue color of the mark is similar. The script is similar. That defendants' mark is singular as opposed to Los Angeles' plural mark is insignificant. *E.g., Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47–48 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) ("it is difficult to conceive of any reason to distinguish" between trademarks that, among other things, "are merely the singular and plural forms of the same word").

■ The periodic use by defendants of a cartoon figure in their logo also does not make the logo dissimilar from Los Angeles' "Brooklyn Dodgers" trademark. The addition of a cartoon figure to a mark is insufficient to prevent a likelihood of consumer confusion. *See also James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976) (mark comprising phrase "Sign of the Beefeater" in combination with a cartoon depiction of a fat hungry man infringed plaintiff's "Beefeater" mark); *Coherent, Inc. v. Coherent Tech., Inc.,* 736 F.Supp. 1055, 1064 (D.Colo.1990) (inclusion of a bug character does not differentiate parties' marks), *aff'd,* 935 F.2d 1122 (10th Cir.1991). Even if the presence of a cartoon character could make two trademarks dissimilar, it does not have that effect here, where the cartoon is omitted from significant uses of defendants' logo, and where defendants concede that their cartoon figure is at least in part an allusion to "the famous 'Brooklyn Bum'" character associated with the "Brooklyn Dodgers." In fact, defendants' witness concedes that the entire mark was designed to allude to the mark used by Los Angeles when it was a Brooklyn-based baseball club. (Tr. 486–89, 569, 688)

Defendants' mark is similar to plaintiffs' "Brooklyn Dodgers" mark used by Los Angeles as a Brooklyn sports club.

### 3. Proximity of the Products

■ The third prong of the *Polaroid* test considers whether the products compete with each other. *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 582 (2d Cir.1991). "To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Lang,* 949 F.2d at 582. Thus, in determining proximity of the products, the court considers content, geographic distribution, market position, and audience appeal. *W.W.W. Pharmaceutical,* 984 F.2d at 573 (*citing C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir. 1985)).

■ Competitive proximity "addresses whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 77 (2d Cir. 1988). Confusion is more likely when the parties compete in the same market.

■ In determining competitive proximity a court will compare such factors as advertising orientation, function of the services, geographical and cultural audiences, style, price, marketing channels and competitor. *See, e.g., McGregor-Doniger,* 599 F.2d at 1134 (upholding district court finding of significant difference in products); *C.L.A.S.S. Promotions,* 753 F.2d at 18 (no proximity though both magazines directed to Black audiences due to difference in appearance, size, content, geographical distribution and audience appeal); *Transamerica Corp. v. Trans-America Abstract Service,* 698 F.Supp. 1067, 1074 (E.D.N.Y 1988) (no proximity though both sell title insurance because different geographical markets targeted). The evidence presented at trial indicated the diversity between the parties' goods and services, their advertising orientation, the function of their services, their geographical markets and their marketing channels and competitors.

Plaintiffs' primary services involve the giving of baseball exhibitions, principally in Los Angeles, sometimes in New York State, never in Brooklyn. Defendants, on the other

hand, provide restaurant and tavern services exclusively in Brooklyn. These services share no common functions, are not competitive, share no salient attributes and are not inherently comparable. Also there is no commonality with respect to the parties' marketing functions, advertising orientation, geographical audiences, etc.[8] In sum, the court finds that the parties do not use the same name and are not in the same business; they cater to different markets 3,000 miles apart. The law, as applied to the facts proven at trial, makes clear that plaintiffs have failed to establish a likelihood of confusion based on this factor.

### 4. Likelihood that Plaintiffs will "Bridge the Gap" Between the Two Markets

■ The "bridging the gap" factor is intended to protect the senior user's ability to bridge the gap; that is, the senior user's "interest in being able to enter a related field at some future time...." *W.W.W. Pharmaceutical*, 984 F.2d at 574 (*citing Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir.1976)). While some allowance is made for the senior user to preserve future expansion possibilities (*see Centaur Communications Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir.1987); *Lever Bros. v. American Bakeries Co.*, 693 F.2d 251, 258 (2d Cir.1982), there must be some credible evidence of the plaintiff's present intent to enter defendants' field.

Plaintiff Los Angeles claims to have existed for more than 100 years. Major League Baseball has existed for over 100 years. "Sports bars" have existed for almost as long. Over all this period Major League Baseball has never operated a sports bar and restaurant nor indicated a desire to do so. The selling of food stuffs such as hot dogs (Dodger Dogs) and the licensing of a single third party in New Jersey to hang photographs is not equivalent to use of a name for a restaurant in Brooklyn or sufficient to indicate a likelihood of bridging the gap. While the court is aware of the evidence presented

at trial that at least one restaurant has used the name of a major league baseball team ("The San Diego Padres") no such evidence was presented with respect to plaintiff Los Angeles. Since plaintiffs have not "bridged the gap" in 100 years, there has been no proof that they will "bridge the gap" in the future.

### 5. Actual Confusion

"The Lanham Act seeks to prevent consumer confusion that enables a seller to pass off [the seller's] goods as the goods of another." *W.W.W. Pharmaceutical*, 984 F.2d at 574 (citation omitted).

■ In order to recover damages under the Lanham Act, "the Second Circuit requires proof of real and precise actual confusion." *W.W.W. Pharmaceutical v. Gillette Co.*, 808 F.Supp. 1013, 1020 (S.D.N.Y.1992), *aff'd*, 984 F.2d 567 (2d Cir.1993) (*citing Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162 (2d Cir.1991); *Getty Petroleum Corp. v. Island Transportation Corp.*, 878 F.2d 650 (2d Cir.1989); *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266 (2d Cir.1987); *Shen Mfg. Co. v. Suncrest Mills, Inc.*, 673 F.Supp. 1199 (S.D.N.Y.1987)).

■ As discussed above,[9] plaintiffs have dropped their claims for monetary damages and are now seeking only injunctive relief which requires proof of a likelihood of confusion, rather than actual confusion. *See W.W.W. Pharmaceutical v. Gillette Co.*, 808 F.Supp. 1013, 1021 (S.D.N.Y.1992), *aff'd*, 984 F.2d 567 (2d Cir.1993). While actual confusion is not required for injunctive relief, *W.W.W. Pharmaceutical v. Gillette Co.*, 808 F.Supp. 1013, 1024 (S.D.N.Y.1992), *aff'd*, 984 F.2d 567 (2d Cir.1993), it is one of the *Polaroid* factors used in this Circuit in determining likelihood of confusion.

■ While the plaintiff in an infringement action need not prove actual confusion, it is proper for the court to infer from the

---

8. The court notes that at various times since opening their restaurants, defendants have offered T–shirts and caps to the public. However, the court finds that this was a minuscule portion of defendants' business as such items were of-

fered principally as promotional items. (Tr. 650, 755)

9. See *supra* p. 1109.

absence of actual confusion, particularly after defendants' operation for a lengthy period of time, that there is no likelihood of confusion. *See also Universal City Studios v. T–Shirt Gallery, Ltd.,* 634 F.Supp. 1468, 1478 (S.D.N.Y.1986); *W.W.W. Pharmaceutical v. Gillette Co.,* 808 F.Supp. 1013, 1024 (S.D.N.Y. 1992), *aff'd,* 984 F.2d 567 (2d Cir.1993) ("absence of evidence of actual confusion over a period of several years is 'a strong indicator that the likelihood of confusion is minimal' ") (*citing Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1006 (2d Cir. 1983)).

■ Plaintiffs presented evidence that certain of defendant SNOD's cancelled checks contained the legend "The Brooklyn Dodgers," alleging that some of defendants' business associates may have confused defendants' singular name with the plural name that plaintiffs held while in Brooklyn. The court concludes that this evidence constitutes typographical errors. Moreover, cancelled checks are no proof of actual consumer confusion of the restaurant with the baseball organization.

■ Plaintiffs also submitted survey evidence which, if credible and not fatally flawed by its structure or content, might have been probative on this factor. *See Universal City Studios,* 634 F.Supp. at 1478. This evidence consists of two (2) consumer surveys. The first survey claims that "46% of relevant consumers believe that the ['Brooklyn Dodger'] restaurant had to obtain authorization from the Los Angeles Dodgers baseball team, or from Major League Baseball, to use this name." (PX 24) In response, defendants retained an expert, Dr. Michael Rappeport, who after his review of plaintiffs' survey, rendered a critique of plaintiffs' first survey which concluded that, for a number of reasons the survey was fatally flawed. Dr. Rappeport identified four substantive or "content" questions that were asked in plaintiffs' survey in addition to a number of screening and/or background questions which

were used to define the sample and/or to separate the respondents into subgroups for analysis purposes. (DX BB at 1) The first two questions—questions 4a and 4b concerned, according to Dr. Rappeport, the issue of association.[10] The court concludes that Dr. Rappeport's criticism of the significance of the associational questions is valid. In other words, the issue here is not whether defendants' name brings to mind any other name; defendants' admit that part of their goal is to promote nostalgia or association with part of Brooklyn's cultural history. Rather, the issue here is one of actual confusion. Plaintiffs' survey questions regarding association are irrelevant to the issue of actual confusion.

The second two questions—questions 5a and 5b concerned the issue of sponsorship. (*See* DX BB at 1–2) The second pair of questions read as follows:

5a Do you believe that the restaurant had to get authorization, that is, permission to use the name, "The Brooklyn Dodger?"

5b From whom did they have to get authorization, that is permission?

According to Dr. Rappeport, the second two questions were intended to determine:

1) That applicable consumers will be confused as to the actual ownership of The Brooklyn Dodger restaurant, i.e. that they will think the restaurant is owned by the owners of the Los Angeles Dodgers baseball team.

2) That applicable consumers will believe that The Brooklyn Dodger restaurant is sponsored/authorized by the people who now own the Los Angeles Dodgers baseball team.

(DX BB at 1–2) Dr. Rappeport found, however, that questions 5a and 5b failed to effectively address the intended issues of confusion regarding actual ownership and authorization and that the questions were "fatally flawed" such that the "questions (and thus

---

10. The first pair of questions read as follows:
4a Do you associate this name with anyone or anything or do you think that it's just the name of the restaurant without any other association, or don't you know?"

4b IF YES: What or who do you associate that name with?

the [plaintiffs'] survey as a whole). do not yield *any meaningful evidence* with regard to the remaining issue of likelihood of sponsorship or authorization." (DX BB at 2) (emphasis in original) Dr. Rappeport explained that questions 5a and 5b were "inherently highly likely to lead respondents in a direction favorable to the plaintiffs." (DX BB at 2)[11]

The court concludes that these questions were leading, causing the survey to be fatally flawed.[12] Moreover, the court concludes that these questions were indistinguishably similar to the questions in *WUV's International v. Love's Enterprises*, 208 USPQ (BNA) 736 (D.Colo.1980) which were also held to be invalid. In *WUV's*, the court concluded that the following question was "open-ended" and "valid":

4. What company or person do you believe owns or operates this restaurant?

However, the court concluded that a subsequent question,

6. Do you believe that this restaurant is connected with or related to any other restaurant?

was "leading and unnecessarily suggestive." 208 USPQ (BNA) 736. Both plaintiffs' questions, 5a and 5b, are leading and suggestive in the same fashion as questions 6 in *WUV's*.

In addition to the leading nature of questions 5a and 5b, Dr. Rappeport criticized what he described at trial as the "central problem" in plaintiffs' survey which was that the survey provided for no controls. Dr.

Rappeport provided in juxtaposition some examples of control questions that plaintiffs might have used.[13] (DX BB at 4) Dr. Rappeport concluded:

> Because [plaintiffs' survey] failed to use any controls, they have no measure of what percentage of respondents are reacting to the particular stimuli and what [percentage] would be confused no matter what they were asked. Thus the interpretation of their data is impossible, and any conclusions drawn from their data must be seen as meaningless.

(DX BB at 4)

As to the entire survey Dr. Rappeport concluded, "in my opinion the results of this survey should be considered to have no value in demonstrating that the applicable public believes that 'The Brooklyn Dodger' restaurant is authorized by or got permission from Major League Baseball Properties, Inc. or the Los Angeles Dodgers, Inc." (DX BB at 5)

In the face of defendants' criticism, plaintiffs commissioned a "Supplemental Consumer Survey" in an attempt to address the criticisms of Dr. Rappeport, defendants' expert. (PX 26) Dr. Rappeport reviewed the "Supplemental Consumer Survey" and testified at trial that while plaintiffs' "Supplemental Consumer Survey" addressed a number of his criticisms, it "never touched, never dealt at all with the fourth and by far the most important of the critiques," concerning lack of controls.[14] (Tr. 428)

---

11. In criticizing the leading nature of plaintiffs' survey, Dr. Rappeport drew proof from an inconsistency in the survey itself. Dr. Rappeport pointed out that 38% of those who did not associate the name with something else (according to question 4a) still said authorization was needed. Dr. Rappeport explained the inconsistency of this result in the following manner:

> The obvious question is "Why would people who did not associate The Brooklyn Dodger restaurant with anything else, let alone baseball, suddenly decide the restaurant needed permission from baseball to operate?" From our experience, by far the most reasonable answer is that the message sent to respondents who said "no association" in answer to 4a was that their initial response was incorrect. Thus, when they are asked about whether anyone gave permission, the natural tendency for many people is to assume that someone must

have given permission and the "test" is to figure out who.
(DX BB at 3)

12. In addition to criticizing the leading nature of plaintiffs' questions, Dr. Rappeport criticized the absence of a "Don't Know" option in plaintiffs' survey. (DX BB at 4)

13. Dr. Rappeport suggested:
The Brooklyn Bridge restaurant (perhaps one needs permission from New York City)
The Brooklyn Yankees restaurant (alluding to the New York Yankees baseball team)
The Brooklyn Eagles restaurant (named after a defunct newspaper)
(DX BB at 4)

14. Plaintiffs argue that the survey was controlled by not changing the question structure—that is, using the same questions that Dr. Rappeport

The court concludes that plaintiffs' surveys are flawed, that both surveys contain a complete lack of controls rendering the data meaningless and having no evidentiary value. Therefore, the court concludes that there is no proof of actual confusion.

### 6. Good Faith or Intent of the Defendant

■■■■ This factor looks to "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [defendant's] and the senior user's product." *W.W.W. Pharmaceutical,* 984 F.2d at 575 (*quoting Lang,* 949 F.2d at 583 (citation omitted)). Even if a junior user has notice of a senior mark, this is not an indication of bad faith. *Edison Bros. Store, Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547, 1560 (S.D.N.Y.1987). Indeed, even if a mark is registered, the presumption of an exclusive right to use it extends only as far as the goods or services noted in the registration certificate. *Mushroom Makers,* 580 F.2d at 48.

The proof at trial clearly establishes that at every turn defendants acted in good faith in electing, adopting, and using their mark. They made no effort to use their mark in such a way as to trade upon the reputation of plaintiff Los Angeles, but rather to elicit memories of the "Brooklyn Dodgers," a historical concept. Indeed, the trial testimony establishes that, given the notoriety of Los Angeles's departure from Brooklyn and the ill will that flows from that event even to this day (PX 31), trading upon Los Angeles' "good will" in Brooklyn would have been fatal to defendants because many Brooklynites despise the "Los Angeles Dodgers." (Tr. 529, 608–09)

The testimony given in this matter establishes that it was defendants' intention that their proposed sports bar would have a strong Brooklyn identity. They first considered the name "Ebbets Field" and commissioned a trademark search for that name. While the search uncovered no current uses of that name, defendants were informed that a small bar in Hicksville, New York was using it. Ironically, wishing to avoid any possible legal entanglements, defendants then did a trademark search of "The Brooklyn Dodger" name. Finding no registration for "Brooklyn Dodgers," and aware that the "Brooklyn Dodgers" had not existed for more than 30 years, Boyle wrote to Peter O'Malley, the owner and president of Los Angeles in the latter part of 1987 and told him that the Boyle restaurant would be called "The Brooklyn Dodger."

On April 28, 1988 defendants filed an application to register "The Brooklyn Dodger" as part of the previously described composite design and mark with the U.S. Patent and Trademark Office and also registered it as a servicemark with the New York State Secretary of State on August 9, 1988. The evidence leaves no doubt but that defendants only took these steps after assuring themselves that no one else was using this mark and after writing to the owner of the Los Angeles Dodgers and advising him of their intent to use "The Brooklyn Dodger" as the name of their restaurant. Such conduct weighs heavily on a court seeking to do equity.[15]

### 7. Quality of Defendants' Services

Plaintiffs merely assert that defendants' products are inferior. This court finds no evidence that defendants' products or services are inferior. Moreover, the trial evidence indicates that the parties' respective products

criticized and comparing the variations, if any. The court concludes that this "control" was insufficient and produced two flawed surveys rather than one sufficient set of surveys.

**15.** The court is cognizant of the fact that trademark rights flow from use, and not from registration, of the mark. Nevertheless, plaintiffs chose to file a registration for its "Dodgers" mark in 1976. They failed to register any "Brooklyn Dodgers" mark until after defendants' application was filed. Then, in 1989 plaintiffs filed

registrations for three different "Brooklyn Dodgers" marks. (PX 2 at 04293, 04303, 04304). This court finds it inescapable that, given the good faith demonstrated by defendants in their having conducted trademark searches on each of the marks they considered, this entire controversy and litigation might have been avoided if plaintiffs had undertaken the simple task of filing an application to register a "Brooklyn Dodgers" trademark as notice to potential users.

and services simply do not compete in any market.

### 8. Sophistication of the Likely Purchasers

"Likelihood of confusion must be assessed by examining the level of sophistication of the relevant purchasers." *W.W.W. Pharmaceutical*, 984 F.2d at 575; *McGregor–Doniger*, 599 F.2d at 1137.

Defendants' patrons are drawn from the general public and to some extent cannot be said to have unique qualities or sophistication. On the other hand, defendants established at trial that a significant number of the customers who patronize defendants' restaurants in Brooklyn are sophisticated concerning the issue before this court—the difference between plaintiffs' goods and services and defendants' services and the likelihood of confusion. Defendants testified that many of the patrons who frequent "The Brooklyn Dodger" are well aware of Los Angeles' now infamous abandonment of the Borough of Brooklyn and—to the third generation since then—remain bitter about it. (Tr. 563, 608–09) In Brooklyn, the "Los Angeles Dodgers" and the "Brooklyn Dodgers" are seen as two separate entities which have been wholly unrelated for more than 30 years. (Tr. 547; 648 *et seq.*) It is unlikely that Los Angeles' now infamous departure from Brooklyn and its attendant negative notoriety could be ignored by actual or would-be patrons of defendants' restaurants. Given the entirety of facts, therefore, there is virtually no likelihood of confusion by these sophisticated consumers that plaintiffs have somehow authorized defendants to do business under "The Brooklyn Dodger" name—a name plaintiffs abandoned when they became the "Los Angeles Dodgers."

### 9. The Centaur Factors

■ In addition to the analysis under *Polaroid* which is required in this Circuit, the Court of Appeals has added three more factors which, when applied, similarly assist the factfinder in determining the core question in any trademark litigation—whether defendants' use of the plaintiffs' mark is likely to cause an appreciable number of reasonably prudent purchasers to believe that services offered by the defendants are from the same source as the goods and services that they know are sold under the plaintiffs' trademark. *See Centaur Communication v. A/S/M Communications*, 830 F.2d 1217, 1228 n. 2 (2d Cir.1987). These so-called *Centaur* factors are: a) the nature of the senior user's priority; b) its delay in asserting its claim and c) the balance of harm and benefit that would result from granting an injunction against the junior user's use of the mark. *Centaur Communication*, 830 F.2d at 1228 n. 2.

The nature of the senior user's priority is particularly germane in this litigation. The evidence at trial established that in October 1958 plaintiffs' goodwill nexus to the Borough of Brooklyn was irretrievably shattered. Following Los Angeles' departure from Brooklyn, no commercial use was made by plaintiffs of any "Brooklyn Dodgers" mark until 1981. However it is likewise clear that in 1981 plaintiffs did resume commercial use of the "Brooklyn Dodgers" mark. While plaintiffs' resumed use was dramatically reduced relative to its use as the name of a major league baseball team, geared primarily toward novelty items and token remembrances, this resumed use occurred prior to defendants' first use of the mark for their restaurants in Brooklyn in 1988. Therefore, plaintiffs have priority to the extent of their use as of 1981.

The second *Centaur* factor, plaintiffs' failure to move in a timely fashion. Plaintiffs claim that they did not learn of defendants' use of "The Brooklyn Dodger" mark until July 1988. The parties agree the plaintiffs' first "cease and desist" request was not made until April 24, 1989 when plaintiffs' counsel sent a letter to Kevin Boyle. (PX 15) Given that defendants' took significant steps in establishing their Brooklyn restaurant business in that interim, plaintiffs' failure to act was somewhat prejudicial.

Finally, on the issue of balancing the harm and benefit which would result from granting an injunction. The balancing of these equities favors defendants. The equities show that prior to its move from Brooklyn, Los Angeles held rights in a strong mark which is very similar to defendants' mark and that

plaintiffs still have priority in use of the mark. However, what the equities also show is a small neighborhood restaurant which has acted in good faith and which has been dogged by this massive litigation brought by plaintiffs who, by their own admission, generated retail sales in excess of $1.5 billion in 1990 and, for reasons never made clear at trial, chose not to file an application to register any "Brooklyn Dodgers" trademark until one year after defendants' application despite plaintiffs' alleged ownership of the mark for almost a century.

This court might have thought that in the execution of its crucial purpose of protecting and preserving the sanctity of major league baseball teams' mark, plaintiff Properties might have found a way, between 1958 and 1989, of taking the simple and expedient step of filing an application for trademark registration of the "Brooklyn Dodgers" name as it plainly did for each of the twenty-six (26) other names in its collection. Having moved away from Brooklyn in 1957, having failed to put the "Brooklyn Dodger" mark to a trademark use of at least two decades and having failed to file an application to register the "Brooklyn Dodger" mark until 1989—a step defendants took in April 1988 for its "The Brooklyn Dodger" mark—the court concludes that the equities lie in defendants' favor. If plaintiffs were still located in Brooklyn and if they had continued to use the mark through the present, then the equities would be different.

When the trial evidence is weighed in the balance this court concludes that, under the *Polaroid* factors, as expanded by the *Centaur* factors, plaintiffs have failed to prove, by a fair preponderance of the credible evidence, actual confusion or a likelihood of confusion between plaintiffs' "Brooklyn Dodgers" mark as used by them in Brooklyn and defendants' "The Brooklyn Dodger" mark.

## C. Defendants' Affirmative Defenses

### 1. Abandonment

Under the Lanham Act a federally registered trademark is considered abandoned if its "use has been discontinued with intent not to resume." *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.,* 892 F.2d 1021, 1023 (Fed.Cir.1989) (*quoting* Lanham Act, 15 U.S.C. § 1127 (1988)).

Abandonment is defined in the Lanham Act: "A mark shall be deemed 'abandoned'— (a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances." 15 U.S.C. § 1127 (1988).

Rights in a trademark are acquired and maintained through use. *See United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918) ("The law of trademarks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption"). *See also D.V.L. Mastrullo, Trademark Parody Litigation and the Lanham Act: Fitting a Square Peg in a Round Hole,* 54 U.CIN.L.REV. 1311, 1324 (1986) ("Rights to a trademark are acquired only through deliberate and continuous use of the trademark, and thus rights to a trademark can be lost where the mark is abandoned or so widely used that it no longer functions as a distinctive representation of the single source of the product"). "A federal registration of a trademark may be cancelled if the mark is abandoned." *Cerveceria India,* 892 F.2d at 1023. *See also Societe de Developments et D'Innovations des Marches Agricoles et Alimentaires–Sodima–Union de Cooperatives Agricoles ("Sodima") v. International Yogurt Co., Inc.,* 662 F.Supp. 839, 843 (D.Or.1987) (Lanham Act permits cancellation at any time where registered mark has been abandoned). Therefore abandonment is an affirmative defense to trademark infringement. *See Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 935 (7th Cir.1989), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990) (abandonment is affirmative defense). The burden of proving abandonment falls upon the party seeking cancellation of a registered mark because a certificate of registration is " 'prima facie evidence of the validity of the registration' and continued use." *Cerveceria India,* 892 F.2d at 1023 (*quoting J.C. Hall Co. v. Hallmark Cards, Inc.,* 340 F.2d 960, 962–63 (CCPA 1965)); *Exxon Corp. v. Humble Exploration Co.,* 695 F.2d 96, 99

(5th Cir.), *reh'g denied*, 701 F.2d 173 (5th Cir.1983) (citation omitted). The party seeking cancellation must establish abandonment by a preponderance of the evidence. *See Cerveceria India*, 892 F.2d at 1023–24.

■ The Lanham Act provides that "[n]onuse for two consecutive years shall be prima facie abandonment." 15 U.S.C. § 1127. *Stetson v. Howard D. Wolf & Assoc.*, 955 F.2d 847, 850 (2d Cir.1992) (prima facie abandonment exists where there has been nonuse for two consecutive years); *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980) (same). *See also Cerveceria India*, 892 F.2d at 1023 ("nonuse for two consecutive years constitutes 'prima facie abandonment'") (*quoting* Lanham Act, 15 U.S.C. § 1127); *Sterling Brewers, Inc. v. Schenley Industries, Inc.*, 441 F.2d 675, 679 (CCPA 1971) (nonuse for over two years constitutes prima facie abandonment). Prima facie abandonment establishes a rebuttable presumption of abandonment. *Lehman*, 625 F.2d at 1044. *See also Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir.1985) (prima facie abandonment creates presumption that may be rebutted); *Roulo*, 886 F.2d at 935 (prima facie abandonment shifts burden of production to trademark owner to explain nonuse or establish existence of intent to resume). *See, e.g., Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1031 (CCPA 1982) ("board properly required appellant to put forth at least some evidence to explain its nonuse which, in conjunction with the presumption of validity [due to trademark registration], might have defeated appellee's case") (citation omitted).[16]

■ The evidence presented at trial established that between 1958 and 1981 plaintiffs made no commercial trademark use[17] whatsoever of any "Brooklyn Dodgers" mark.[18] Minor changes in a trademark that do not affect the overall commercial impression of the mark do not constitute abandonment. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir.), *reh'g en banc denied* (*quoting* 1 J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 17:10, at 787 (2d ed.1984)). However, Los Angeles' change, in this case, from "Brooklyn Dodgers" to "Los Angeles Dodgers" was not minor; it involved an essential element affecting the public's perception of the mark and the team.[19] *Compare Quaker Oats*, 978 F.2d at 955 (change from THIRST–AID, FIRST AID FOR YOUR THIRST to THIRST–AID not abandonment) *and Puritan Sportswear Corp. v. Shure*, 307 F.Supp. 377 (W.D.Pa.1969) (change from PURITAN SPORTSWEAR, THE CHOICE OF ALL AMERICANS to PURITAN not abandonment).

Moreover, plaintiffs in this case did not simply adopt a second name, "Los Angeles Dodgers," in addition to their first name,

---

16. While the Second Circuit has determined that prima facie abandonment establishes only a rebuttable presumption of abandonment that plaintiffs may counter by satisfying a burden of producing evidence of intent to resume, *Lehman*, 625 F.2d at 1044, other circuits have held that the burden of persuasion shifts to the trademark owner to show intent to resume. *See Stanley A. Bowker, Jr., The Song is Over But the Melody Lingers On: Persistence of Goodwill and the Intent Factor in Trademark Abandonment*, 56 FORDHAM L.REV. 1003, 1021 (1988) (discussing differences among circuits in allocating evidence burden).

17. That is, they sold no goods or services under the mark and did not license its use to third parties in the ordinary course of trade.

18. In fact, plaintiffs did not even attempt to register a "Brooklyn Dodgers" mark or a "Brooklyn" mark until well after this action had been filed.

19. While Los Angeles ceased commercial use of the trademark because of its relocation from Brooklyn to Los Angeles, its motive, justifiable or not, is irrelevant. *Stetson*, 955 F.2d at 851. Nevertheless, Los Angeles' nonuse in this case was voluntary. Courts have been more reluctant to find an absence of intent to resume where the trademark owner had an excusable reason for nonuse—that is, where nonuse was involuntary. *See, e.g., Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1059 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985) (no abandonment where cessation of business was involuntary); *American International Group, Inc. v. American International Airways, Inc.*, 726 F.Supp. 1470 (E.D.Pa. 1989) (where airline declared bankruptcy, remaining goodwill and lack of intent to abandon precluded finding abandonment).

"Brooklyn Dodgers," as did plaintiff in *Guiding Eyes For the Blind, Inc. v. Guide Dog Foundation For the Blind, Inc.*, 384 F.2d 1016 (CCPA 1967). In *Guiding Eyes*, appellee adopted a second trademark, "Second Sight," for use in addition to its original trademark "Guiding Eyes." The court held that because appellee had continued to use the original mark after and along with its use of the second mark, there was no abandonment of the original mark. In this case, however, plaintiffs did not use the "Los Angeles Dodgers" mark along with the "Brooklyn Dodgers" mark; plaintiffs used the "Los Angeles Dodgers" mark instead of the "Brooklyn Dodgers" mark as the name of the sports team.

Plaintiffs argue that their "Dodgers" mark without a geographical reference—that is, "Dodgers" alone—is a protected use infringed by defendants actions. However, in this context, "Brooklyn" is more than a geographic designation or appendage to the word "Dodgers." The *"Brooklyn* Dodgers" was a non-transportable cultural institution separate from the "Los Angeles Dodgers" or the "Dodgers" who play in Los Angeles. It is not simply the "Dodgers," (and certainly not the "Los Angeles Dodgers"), that defendants seek to invoke in their restaurant; rather defendants specifically seek to recall the nostalgia of the cultural institution that was the "Brooklyn Dodgers." It was the *"Brooklyn* Dodgers" name that had acquired secondary meaning in New York in the early part of this century, prior to 1958. It was that cultural institution that Los Angeles abandoned.

Nevertheless, assuming arguendo, that the relevant mark is "Dodgers" which plaintiffs claim to have used continuously for the past fifty years for sports and entertainment purposes, the parties uses are sufficiently distinct to permit defendants' use. Plaintiffs did not register the "Dodgers" mark (without "Brooklyn") for commercial use until 1967, almost a decade after their abandonment. (PX 2) Plaintiffs, even after using the "Dodger" mark for fifty years, have never used the name for a nostalgic sports restaurant as defendants have. Defendants in operating their restaurant did not register the "Dodger" mark (without "Brooklyn") and have not used the "Dodger" mark in any form outside of New York. However, this court concludes that "Brooklyn Dodgers" rather than "Dodgers" is the trademark that acquired secondary meaning as a cultural institution in New York, and it is "Brooklyn Dodgers" rather than "Dodgers" that is at issue in this litigation.

A determination of the issue of abandonment requires an analysis of the trademark holder's occupation or business to determine what constitutes use of the mark. *Stetson*, 955 F.2d at 851. In this case, in order to maintain use of the mark, Los Angeles would have had to continue to use "Brooklyn Dodgers" as the name of its baseball team. Only in this way would the public continue to identify the name with the team. *Defiance Button Mach. Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1059 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985) (if owner abandons mark through nonuse with intent not to resume, "others are no longer restrained from using it since it ceases to be associated in the public's mind with the owner's goods or services") (*citing Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 630 (2d Cir.1980)).[20] *See, e.g., Stetson*, 955 F.2d

**20.** The outcome in *Defiance,* finding no abandonment, is distinguishable from the case at hand because the court in *Defiance* held that the continued goodwill toward the button company after it stopped producing goods and the fact that the company intended to retain its trademark for some commercial use precluded a finding of abandonment. Similarly, the court·in *Schenley Industries*, 441 F.2d 675 held that continued goodwill and lack of intent to abandon precluded finding of abandonment.

In the unique facts of this case, however, plaintiffs have not succeeded in demonstrating that much goodwill in Brooklyn survived Los Angeles' move in 1957. But more importantly, while plaintiff in *Defiance* was at least able to demonstrate an intent not to abandon, plaintiffs here have not even demonstrated an intent not to abandon, much less the statutory requirement of intent to resume. A mark retains "residual" goodwill "if the proponent of a mark stops using it but demonstrates an intent to keep the mark alive for use in resumed business." *Pan American World Airways, Inc. v. Panamerican School of Travel, Inc.*, 648 F.Supp. 1026, 1031 (S.D.N.Y.), *aff'd without op.*, 810 F.2d 1160 (2d Cir.1986)

at 851 (use must be sufficient to maintain public's identification of mark with proprietor).

■ Evidence was presented at trial that Los Angeles occasionally gave written permission, for little or no compensation, to use the "Brooklyn Dodgers" name. In 1959, Los Angeles made prominent commercial use of and reference to their Brooklyn heritage and trademarks in connection with the promotion of Roy Campanella Night, honoring the former Brooklyn Dodgers player and present employee. (Tr. 94–96, 266–67; PX 1 at 2) Los Angeles made prominent use of their trademarks incorporating the word Brooklyn at their annual oldtimers games. (PX 1 at 37, 40; Tr. 270) Oldtimers games are commercial baseball exhibitions at which former players are honored and perform so that older fans can recall the past and younger fans can learn about the history of the Club. (Tr. 267–68)

■ The case law is clear that such uses do not constitute trademark uses of the "Brooklyn Dodgers" name. Amended Section 45 of the Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in the mark." 15 U.S.C. § 1127.[21] Neither "'challenging infringing uses' nor 'sporadic licensing' for noncommercial activities constitutes use." *Stetson*, 955 F.2d at 851 (*quoting Silverman v. CBS, Inc.*, 870 F.2d 40, 47 (2d Cir.), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989)); *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir.1974) (*citing* 3 Callmann, Unfair Competition, Trademarks & Monopolies § 76.2(d) (1969)) ("To prove bona fide usage, the proponent of the trade-

mark must demonstrate that [its] use of the mark has been deliberate and continuous, not sporadic, casual or transitory").

■ Rather than using the "Brooklyn Dodgers" mark in the ordinary course of trade, a more accurate description of Los Angeles' use of the mark, at least between 1958 and 1981, was given by its General Counsel in a 1985 letter to someone seeking to use it on a novelty item:

> Since the Dodgers moved to Los Angeles in 1958 the name 'Brooklyn Dodgers' has been reserved strictly for use in conjunction with items of historical interest. (PX 9)

Under the law, such warehousing is not permitted. *See Jean Patou*, 495 F.2d at 1272 (citation omitted) ("where no present intent has been found to market the trademarked product, minimal sales have been held insufficient to establish trademark rights"). *See also Exxon*, 695 F.2d at 101 ("The Act does not allow the preservation of a mark solely to prevent its use by others"). Instead, trademarks must be used as trademarks to retain enforceable property rights in them. *Stetson*, 955 F.2d at 851 (*quoting Silverman*, 870 F.2d at 48) (use must be "sufficient to maintain 'the public's identification of the mark to the proprietor'"). Rights in a trademark are lost when trademarks are "warehoused" as plaintiffs attempted to "warehouse" the "Brooklyn Dodgers" mark for more than two (2) decades. *See Stetson*, 955 F.2d at 851 ("trademark must be used or lost to another economic actor more willing to promote the mark in commerce"). Plaintiffs' failure to use the "Brooklyn Dodgers" trademark between 1958, when Los Angeles left Brooklyn, and 1981 constitutes abandonment of the trademark.[22]

---

(*citing Defiance, supra*). The claim to residual goodwill will not preclude a finding of abandonment where, as in this case, the owner unequivocally declares its intention to discontinue use. SIEGRUN D. KANE, TRADEMARK LAW: A PRACTITIONER'S GUIDE 167 (1987).

**21.** *See also S. Bowker, supra*, at 1022 (Lanham Act, as interpreted by Fifth Circuit in *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96 (5th Cir.), *reh'g denied*, 701 F.2d 173 (5th Cir. 1983), requires "not just use, but active commercial use").

**22.** *See also Susan Naresh, Incontestability and Rights in Descriptive Trademarks*, 53 U.CHI. L.REV. 953, 981 n. 120 (1986) (distinguishing between intentional and unintentional abandonment). "'Unintentional abandonment' contrasts with 'intentional abandonment': the latter occurs when use of the mark has been discontinued with intent not to resume it, and the former when the registrant's conduct causes the mark to lose its significance as a indication of origin." *S.Naresh, supra*, at 981 n. 120 (*citing* Lanham Act, 15 U.S.C. § 1127(a), (b)). Plaintiffs' abandonment in this case fits both definitions, to

In this Circuit the law of trademark abandonment is set forth in *Silverman v. CBS, Inc.*, 870 F.2d 40 (2d Cir.1989). *See also Stetson*, 955 F.2d at 850–51 (district court should use *Silverman* criteria). In *Silverman* a dispute arose over the use of the characters from the "Amos & Andy" radio and television programs. Although CBS held the trademark and copyrights from the original airings, it had discontinued its broadcasts in 1966 due to criticism as to the programs' negative stereotyping of African–Americans. In 1981 Silverman wrote a script for a Broadway musical based on the "Amos & Andy" characters and sought a license from CBS to use them. When CBS refused, Silverman brought an action seeking, *inter alia*, a declaratory judgment that CBS no longer had any rights in these marks. Silverman argued that CBS' failure to broadcast the programs or to make commercial use of the characters led to an abandonment of the marks. CBS countered that its discontinuance of the program broadcasts was done for "worthy motives." In addition, CBS claimed, not unlike plaintiffs here, that it had licensed the program for non-commercial use, had challenged infringing uses of the name brought to its attention, and periodically considered whether to resume use of the programs. 870 F.2d at 47. The court in *Silverman* found no merit in CBS's claims and found all of its "Amos & Andy" property rights to have been abandoned.

 This court concludes that the *Silverman* rationale applies here and that plaintiffs abandoned the "Brooklyn Dodgers" trademark. Plaintiffs plainly had not used the term "Brooklyn Dodgers" for trademark purposes for at least 23 years following their departure from Brooklyn. Their occasional licensing and using the name for historical retrospective and matters of historical interest did not constitute trademark uses of the mark but were non-commercial activities and certainly not more than sporadic. Defendants, therefore, have proven nonuse by plaintiffs sufficient for their claim of abandonment.

 Abandonment under the Lanham Act, however, requires both nonuse and intent not to resume use. *Stetson*, 955 F.2d at 850 (citation omitted); *Lehman*, 625 F.2d at 1043 (abandonment requires nonuse and intent not to resume). *See also Loctite Corp. v. National Starch and Chemical Corp.*, 516 F.Supp. 190, 218 (S.D.N.Y.1981) (*citing Lehman*, 625 F.2d at 1043) (same); *Sodima*, 662 F.Supp. at 843 (statute contains elements of intent and nonuse, and intent not to use may be "inferred from actual non-use which has lasted for two years").

 Once prima facie abandonment has been proven, the trademark registrants—in this case plaintiffs—must carry their burden of producing evidence that there was an intent to resume use of the trademark. *Cerveceria India*, 892 F.2d at 1025–26. *See also Sodima*, 662 F.Supp. at 844–45, 848–49; *Schenley Industries*, 441 F.2d at 679. While the trademark registrant has the burden of production as to intent to resume, the ultimate burden of persuasion remains with the party claiming abandonment. *Quaker Oats*, 978 F.2d at 956.

 Rather than merely proving that it did not intend to abandon its trademark, the trademark registrant must demonstrate that it intended to use or resume use. *See Exxon*, 695 F.2d at 99, 102–103 ("Stopping at an 'intent not to abandon' [rather than 'intent to resume'] tolerates an owner's protecting a mark with neither commercial use nor plans to resume commercial use. Such a license is not permitted by the Lanham Act"); *Roulo*, 886 F.2d at 938 (discussing differences among circuits in requiring intent to resume versus intent not to abandon and holding that proper test is intent to resume); *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1550 (11th Cir.1986) (inquiry is intent to resume rather than intent not to abandon). *See also Sodima*, 662 F.Supp. at 849 (same). Lack of intent to resume use may be inferred from the circumstances surrounding the nonuse of the mark. *Vitaline Corp. v. General Mills*,

some extent. On one hand, plaintiffs' discontinued use of the "Brooklyn Dodgers" mark for over 20 years with no intent to resume use. On the other hand, plaintiffs' moved from Brooklyn to Los Angeles and adopted the "Los Angeles Dodgers" trademark, causing the "Brooklyn Dodgers" mark to lose its significance as a name of an existing sports club.

*Inc.*, 891 F.2d 273, 275 (Fed.Cir.1989) ("Although abandonment requires both non-use and intent not to resume use of the mark, the element of intent can be established inferentially by the same facts that establish nonuse"). *See also Anvil Brand, Inc. v. Consolidated Foods Corp.*, 464 F.Supp. 474, 481 (S.D.N.Y.1978) (inference of intent not to resume use may be drawn from proof of nonuse for two years). For Los Angeles to have had an "intent to resume" it must have had plans to resume commercial use of the mark within two years at the time that it left Brooklyn in 1958. *See Exxon*, 695 F.2d at 102; *Imperial Tobacco, Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1580 (Fed.Cir.1990) ("where there is use, followed by a period of nonuse, the question is whether the registrant 'discontinued' use with an 'intent not to resume'" (no citation)). *See, e.g. E. Remy Martin & Co., S.A. v. Shaw–Ross International Imports, Inc.*, 756 F.2d 1525, 1532 (11th Cir.), *reh'g denied, enbanc*, 765. F.2d 154 (11th Cir.1985) (party that discontinues use must show plans to resume commercial use).

■ Plaintiffs have in no way demonstrated their intent to resume commercial use of the "Brooklyn Dodgers" mark within two years after Los Angeles left Brooklyn in 1958 or at anytime within the ensuing quarter century. In *Ambrit*, the court ruled that registration of a mark during a period of abandonment is insufficient to prove intent to resume. Plaintiffs changed their name from "Brooklyn Dodgers" to "Los Angeles Dodgers" immediately after arriving in Los Angeles. They registered their new name "Los Angeles Dodgers" in 1958. They did not register simply as the "Dodgers" which plaintiffs claim is their true trademark until 1967. Here, plaintiffs neither registered the "*Brooklyn* Dodgers" mark prior to their resumed use of the mark in 1981 nor did they produce any other evidence indicating that they had plans to resume use of the "Brooklyn Dodgers" mark when they intentionally abandoned it and Brooklyn in 1958.

2. Resumption

Having determined that plaintiffs abandoned the "Brooklyn Dodgers" mark, the next inquiry is to determine the effect of that abandonment, given that plaintiffs have recently resumed limited use of the trademark.

Plaintiffs resumed use of the "Brooklyn Dodgers" mark in 1981 following an abandonment of almost a quarter of a century. In 1981, plaintiffs licensed Eastport Manufacturing Co. to merchandise T-shirts bearing, *inter alia*, the "Brooklyn Dodgers" name and logo. (PX 19; Tr. 79–81) In 1984, Los Angeles agreed to permit Martin Dorf to use photographs of the "Brooklyn Dodgers" as wall decorations in a restaurant in New Jersey called Burger Boys of Brooklyn. (PX 4; Tr. 278–79) In 1985, Los Angeles authorized United Airlines to broadcast radio commercials which referred to the "Brooklyn Dodgers." (PX 6; Tr. 282) In 1986, Los Angeles agreed to license the Bank of New England to run an advertisement using Los Angeles' trademarks incorporating the word Brooklyn. (PX 5; Tr. 281) In 1986, Los Angeles entered into an agreement with Oxford University Press to permit them to use the "Brooklyn Dodgers" mark in connection with a book. (PX 7; Tr. 283) In 1986, plaintiffs authorized Trench Manufacturing Co. to sell various items of merchandise bearing, *inter alia*, the "Brooklyn Dodgers" mark. (PX 20; Tr. 82) In approximately 1986, plaintiff Properties began promoting Los Angeles' trademarks incorporating the word Brooklyn, together with other "oldtimer" trademarks of Major League Clubs (that is, trademarks that had not been worn on the playing field for at least five years) under the name "The Cooperstown Collection." (Tr. 83–86; *see also* PX 18) In March 1987, plaintiffs and Roman Art Embroidery Corporation entered into a licensing agreement to manufacture and sell caps bearing, *inter alia*, the "Brooklyn Dodgers" mark. (PX 21; Tr. 83–84) Los Angeles licensed the use of their marks incorporating the word "Brooklyn" in connection with the television series "Brooklyn Bridge." Los Angeles licensed the Brooklyn Dodgers Hall of Fame, located in Brooklyn, to use Los Angeles' trademarks incorporating the word "Brooklyn." (Tr. 294) These were all sporadic licensings of the use of the words "Brooklyn Dodgers"; none was for continuous commercial use of the words "Brooklyn Dodgers" by plaintiffs themselves

prior to 1986 when Properties entered the name in the Cooperstown Collection.

Defendants did not select the name "The Brooklyn Dodger" for their restaurant until sometime after October 14, 1987, and did not open their first bar and restaurant using their "Brooklyn Dodger" logo until March 1988. (Tr. 383, 480, 490–91, 541, 621) Plaintiffs, on the other hand, resumed use of the Brooklyn Dodgers mark, as indicated above, a relatively short time prior to the opening of defendants' restaurant.

While no case law in this Circuit has been found precisely on point, the Eleventh Circuit has addressed this issue and held that an abandonment, once established, is not cured by a resumption of use and that upon resumption of use of the mark the holder's rights flow from the date it resumes use. *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir.1986). In *Ambrit*, plaintiff sought to cancel Kraft's "Polar B'ar" trademark due to abandonment pursuant to Section 45 of the Lanham Act. What was novel about *Ambrit* was the fact that at the time plaintiff sought cancellation of the mark, Kraft had resumed extensive use of it. The Eleventh Circuit held:

> [Plaintiff] does not argue that Kraft's current use of the mark is insignificant and, indeed it is beyond dispute that abandonment would be out of the question had Kraft used the mark continuously from 1932 to 1980 in the same manner that it is now using the mark. Rather [plaintiff] contends that Kraft's non-use between 1932 and 1980 caused the mark to be void. [Plaintiff] asserts that Kraft's subsequent use beginning in 1980 does not retroactively cure its past abandonment. We agree.

*Ambrit*, 812 F.2d at 1550.

The court rejected Kraft's argument that its resumption of the use of the mark in 1980 made a cancellation of the registration in 1986 inappropriate. The court found that once abandoned, a mark may be cancelled even after its holder resumes commercial use of the mark. *Id.* at 1551. As applied to this case, then, once plaintiffs abandoned the "Brooklyn Dodgers" mark, they forfeited the right to exclude defendants from using the mark. *Defiance Button Machine Co. v. C &*

*C Metal Products Corp.*, 759 F.2d 1053, 1059 (2d Cir.1985) (when owner abandons mark, "others are no longer restrained from using it . . ."). Even though plaintiffs resumed use of the mark before defendants began using the mark, plaintiffs' abandonment critically alters their rights to the mark. *Ambrit*, 812 F.2d at 1551 ("the competitor's right to cancel the registration flows not from the competitor's use of the mark but from the holder's abandonment"); *First Nat. Bank v. Autoteller Systems Service Corp.*, 9 U.S.P.Q.2d 1740 (BNA) (Trademark Trial & App.Bd. 1988) (Abandonment cannot be reversed by subsequent re-adoption of a mark"); *Parfums Nautee Ltd. v. American International Industries*, 22 U.S.P.Q.2d (BNA) 1306 (Trademark Trial & App.Bd.1992) (same). *See also Sodima*, 662 F.Supp. at 850 (citation omitted) ("Once a mark is abandoned, subsequent use does not retroactively cure its past abandonment. A court may cancel a mark because of abandonment even after the registrant has resumed use"). Therefore, in 1988 defendants' in this case had rights equal to plaintiffs' rights in using the mark and acquiring the mark. *Cerveceria India*, 892 F.2d at 1027 (*citing Mission Dry Corp. v. Seven-up Co.*, 193 F.2d 201, 203 (CCPA 1951) ("Once a trademark is abandoned, its registration may be cancelled even if the registrant resumes use").

This analysis of the effect of the abandonment of a trademark comports with the view expressed by one highly regarded commentator in this area who observes:

> Once a mark has been abandoned, "any other person has the right to seize upon it immediately . . . and thus acquire a right superior not only to the right of the original user but of all the world . . . Even though a mark has been intentionally abandoned, if there is no intervening right thereto, it would be illogical to deny its former owner the same right to appropriate it as any other party would have . . . *Appropriation after abandonment is a new phase in the history of the mark,* and it should be considered without reference to the abandonment, whether appropriated by a stranger or reused by its prior owner. *Priority, however, goes back only to the*

*time the first owner reappropriated the mark.*

Callmann, *The Law of Unfair Competition, Trademarks, and Monopolies* § 19.67 at 515 (1989) (emphasis added).

These legal principles, when applied to the facts at bar, make plain that if plaintiffs have any interest in a "Brooklyn Dodgers" mark, that interest arose in 1981 when commercial use of the mark resumed after a twenty-three (23) year hiatus. Plaintiffs' preemptive rights in the "Brooklyn Dodgers" mark would extend only to the precise goods on or in connection with which the trademark was used since its resumption (i.e. clothing, jewelry, novelty items). (*See* the various uses listed at PX 2)

In other words, the fact that plaintiffs resumed use prior to defendants' use does not mean that plaintiffs may preclude defendants' use of the mark in their restaurant business in Brooklyn. *See Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 630 (2d Cir.1980) (where plaintiff began using abandoned mark slightly prior to defendant, significant use by defendant precluded plaintiffs' exclusivity; "concept of priority in the law of trademarks is applied 'not in its calendar sense' but on the basis of 'the equities involved,'" *quoting Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 534 (2d Cir.1964)). The Supreme Court discussed the common law allocation of trademark rights in *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916). In setting forth an exception to the blanket application of the "prior use" rule, the Court stated:

> In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question. But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote from one another, the question of prior appropriation is legally insignificant, unless at least it appear [sic] that the second adopter has selected the mark with some design inimical to the interest of the first user ...

*Hanover*, 240 U.S. at 415, 36 S.Ct. at 361. *See also Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 928 (8th Cir.1967) (prior trademark user has valid common law trademark within area developed by it). *See, e.g., Li'l Red Barn, Inc. v. Red Barn System, Inc.*, 322 F.Supp. 98, 109 (N.D.Ind.), *aff'd,* 174 U.S.P.Q. (BNA) 193 (7th Cir.1972) (restaurant use of mark did not infringe with convenience store use of mark).

The court concludes that plaintiffs' interest, which is a new phase in the history of this mark, is only in the fields in which the mark has been used since plaintiffs chose to resume its use. *See, e.g., Conwood Corp. v. Loew's Theatres, Inc.*, 173 U.S.P.Q. (BNA) 829 (Trademark Trial & App.Bd.1972) (where trademark holder resumed use after competitor began using mark, trademark holder's use was new). The evidence makes clear that the uses to which the plaintiffs put their marks were generally sportswear and novelty items which are in no way related to defendants' restaurant and tavern services in the limited geographic area of New York City known as Brooklyn.

In addition to using the "Brooklyn Dodgers" mark for different purposes than defendants, plaintiffs presented no evidence that their commercial uses since 1981 (as opposed to their uses as the Brooklyn Dodgers baseball team prior to 1958) extend into defendants' geographical area of use. "[I]f the use of the marks by the registrant and the unauthorized user are confined to two sufficiently distinct and geographically separate markets, with no likelihood that the registrant will expand his use into defendant's market, so that no public confusion is possible, then the registrant is not entitled to enjoin the junior user's use of the mark." *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364 (2d Cir.1959). *See also Tally–Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1023 (11th Cir.1989) (subsequent use may establish common law rights to same mark for similar products as long as there is no competitive overlap with prior user); *Comidas Exquisitos, Inc. v. O'Malley & McGee's Inc.*, 775 F.2d 260, 262 (8th Cir. 1985) (use in geographically separate and distinct areas with no real competition or likelihood of expansion presents no cause for relief); *Cotton Ginny, Ltd. v. Cotton Gin,*

*Inc.*, 691 F.Supp. 1347, 1352 (S.D.Fla.1988) (despite plaintiff's prior use, "trademark is acquired only within those markets where the mark has been used and its meaning become known") (*citing Hanover,* 240 U.S. at 415–16, 36 S.Ct. at 361 *and Spartan Food Systems, Inc. v. HFS Corp.,* 813 F.2d 1279, 1282–84 (4th Cir.1987)). *See, e.g., Wiener King, Inc. v. The Wiener King Corp.,* 546 F.2d 421 (3rd Cir.1976), *published at,* 192 U.S.P.Q. 353 ("Absent proof that plaintiff's 'advertising,' 'expansion,' or 'reputation' would operate to extend plaintiff's trade area beyond the locale where its products are sold, we are obliged to limit plaintiff's protection to just that area of sale").

Plaintiffs have not in any way demonstrated that the restaurant business in Brooklyn is a market into which they might naturally expand. *See Tally–Ho,* 889 F.2d at 1023 (rights limited to territories of actual use or natural expansion). In order for New York to be considered to be within plaintiffs' zone of expansion, the public in New York must be familiar with plaintiffs as providers of restaurant services under the "Brooklyn Dodgers" mark. *See also Stouffer Corp. v. Winegardner & Hammons, Inc.,* 502 F.Supp. 232, 236 (S.D.Ohio 1980) (protection requires secondary meaning in area such that public associates name with services in that area) (citation omitted); *Hot Shoppes, Inc. v. The Hot Shoppe, Inc.,* 203 F.Supp. 777, 783 (M.D.N.C. 1962) (necessary for substantial section of purchasing public to identify name with services). *See generally* RUDOLF CALLMANN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES, v. 3, § 19.19–23 (1983) (discussing zones of protection); *William Jay Gross, The Territorial Scope of Trademark Rights,* 44 U.MIAMI L.REV. 1075 (1990) (discussing various categories of zones of protection).

For example, even if plaintiffs' post–1981 uses indicate that Brooklyn is within plaintiffs' zone of expansion for novelty items, plaintiffs only post–1981 restaurant related use—permitting a third party to use photographs as wall decorations in New Jersey— does not demonstrate that plaintiffs' zone of expansion includes using the "Brooklyn Dodgers" name in the context of commercial restaurant services in Brooklyn. *See also Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler,* 305 F.Supp. 1210, 1213 (N.D.Ca.1969) (in context of motion for preliminary injunction, defendant's San Francisco restaurant was sufficiently far from plaintiff's Los Angeles restaurant to preclude finding of infringement). *Compare McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268 (S.D.N.Y.1986) (where plaintiff had national chain, as opposed to a single use, defendants' name McBagel's infringed restaurant chain's mark using the formatives "Mc" and "Mac") *with National Automobile Club v. National Auto Club, Inc.,* 365 F.Supp. 879, 886 (S.D.N.Y.), *aff'd without op.,* 502 F.2d 1162 (2d Cir.1974) (while both plaintiff and defendant rendered national services, the type of services rendered by defendant were sufficiently distinct to be outside plaintiff's zone of expansion).

This court holds that plaintiffs' failure to utilize the "Brooklyn Dodgers" mark for any significant, commercial trademark use between 1958 and 1981 constituted an abandonment of that mark and dramatically limits the protection to which that mark is entitled since its resumption. *See, e.g. Mission Dry Corp. v. Seven-up Co.,* 193 F.2d 201 (CCPA 1951) (Lanham Trademark Act of 1946 "provides for the cancellation of a registration of any mark which has been so abandoned ... whether or not there was confusing similarity between the marks of the parties"). Although there was evidence of a very limited number of food services and food items (Dodger Dogs, etc.) in plaintiffs' stadium in Los Angeles and training camp in Florida, no evidence was introduced by plaintiffs on this critical issue to prove that this mark, "Brooklyn Dodgers," has been used by plaintiffs or licensed by plaintiffs for a restaurant such as the singularly nostalgic restaurant defendants operate in Brooklyn. Accordingly, the court declines to enjoin defendants' very limited use of the "Brooklyn Dodger" mark by defendants for use in connection with its local restaurants directed toward older Brooklyn Dodgers fans in the Brooklyn community in the city of New York. The court also declines to cancel any registration of the "Brooklyn Dodgers" mark by plaintiffs for use of that name for the sale

of goods such as T-shirts, caps, memorabilia, etc.

### 3. Laches

Because this court concludes that defendants prevail on their affirmative defense of abandonment, it is not necessary to address defendants' second affirmative defense of laches.

### D. *Plaintiffs' State Law Claims*

#### 1. Unfair Competition

■■■ Plaintiffs claim for unfair competition under New York State law shares many common elements with the Lanham Act claims of false designation of origin and trademark infringement, including necessary proof of actual confusion before an award of damages may be granted. *See W.W.W. Pharmaceutical*, 984 F.2d at 576 (citations omitted). This court has concluded that the marks used by Los Angeles when it was located in Brooklyn and defendants' mark is not confusingly similar. This court has also concluded that plaintiffs abandoned the mark. The findings provide defendants with an effective affirmative defense to plaintiffs' claim of unfair competition. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980) ("Since New York state law on the issue of abandonment, even if applicable, is not particularly well-developed, it is appropriate to apply federal law by analogy, with respect to both the state and federal claims"). *See Charvet S.A. v. Dominique France, Inc.*, 736 F.2d 846 (2d Cir.1984) (in action involving Lanham Act and state unfair competition and dilution claims, abandonment by appellant precluded appellants' use to the extent of its abandonment and defeated its claims, state and federal, concerning abandoned markets).

#### 2. Dilution Claim

Plaintiffs' also claim that defendants have violated New York's anti-dilution statutes. N.Y.Gen Bus.L. § 368–d (McKinney 1984).[23]

"A claim for dilution rests on the allegation that a defendant is attempting to "feed[ ] upon the business reputation of an established distinctive trade-mark or name." *W.W.W. Pharmaceutical*, 984 F.2d at 576 (quoting *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977)).

■■■ In this circuit, the test for dilution has consisted of three elements:

(1) distinctiveness of the mark, either that the mark is "truly of distinctive quality" or has acquired secondary meaning in the eyes of the public; (2) likelihood of dilution, either as the result of blurring of product identification or the tarnishing of an affirmative association that a mark has come to convey; and (3) predatory intent.

*W.W.W. Pharmaceutical*, 984 F.2d at 576–77 (citing *Lobo Enters., Inc. v. Tunnel, Inc.*, 693 F.Supp. 71, 79 (S.D.N.Y.1988)) (quoting *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625–26 (2d Cir.1983)); *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir.1989). Because the court has concluded that plaintiffs abandoned their right to the "Brooklyn Dodgers" mark when they left Brooklyn, any right that they may have established upon resumption is significantly diminished and remote. Therefore, given the dramatic dilution caused by plaintiffs' own actions, plaintiffs have failed to prove distinctiveness, likelihood of dilution, or predatory intent necessary to prevail on a claim of dilution.

### E. *Defendants' Counterclaims*

■■■ In their Amended Answer, defendants' counterclaimed for the cancellation of various trademark registrations for "Brooklyn Dodgers" file by plaintiffs after defendants' application to register the "Brooklyn Dodger" servicemark was filed on April 28, 1988. These cancellations are sought on the ground that plaintiffs' registrations: a) falsely and deceptively suggest and imply a con-

---

**23.** The statute provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark regis- tered or not registered or in cases of unfair competition, not withstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

nection between plaintiffs and the Borough of Brooklyn which has not existed since 1958; b) inherently and directly misrepresent the origin of plaintiffs' goods and services as Brooklyn, New York when this is allegedly untrue in violation of 15 U.S.C. § 1052; and c) plaintiffs' use of a "Brooklyn Dodgers" mark suggests an association with defendants which does not exist, in violation of 15 U.S.C. § 1125(a).

Defendants' counterclaims are denied. As discussed above, plaintiffs resumed use of the "Brooklyn Dodgers" mark prior to defendants' use. Plaintiffs, therefore, have acquired the right to use and register the mark to the extent of their resumed use (i.e. clothes, novelty items, and promotional features) or to the extent that it does not infringe upon the prior uses of others.

Submit order on 10 days notice.